**Etim U. AKA, Appellant,**

v.

**WASHINGTON HOSPITAL CENTER, Appellee.**

No. 96–7089.

United States Court of Appeals, District of Columbia Circuit.

Argued in banc May 13, 1998.

Decided Oct. 9, 1998.

Appeal from the United States District Court for the District of Columbia (No. 94cv01281).

Gregg D. Adler argued the cause for appellant, with whom James L. Kestell was on the briefs.

Stewart S. Manela argued the cause for appellee, with whom Henry Morris, Jr., and Anne M. Hamilton were on the briefs. Samuel K. Charnoff entered an appearance.

Barbara L. Sloan, Attorney, Equal Employment Opportunity Commission, argued the cause for amicus curiae, with whom Lorraine C. Davis, Assistant General Counsel, was on the briefs. Philip B. Sklover, Associate General Counsel, entered an appearance.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL and GARLAND, Circuit Judges.

Dissenting Opinion filed by Circuit Judge HENDERSON, with whom SILBERMAN, WILLIAMS and GINSBURG, Circuit Judges, join.

Dissenting Opinion filed by Circuit Judge SILBERMAN, with whom WILLIAMS and GINSBURG, Circuit Judges, join.

WALD, Circuit Judge:

In 1991, Etim U. Aka ("Aka") underwent heart bypass surgery, and thereafter was unable to perform his prior job as an orderly at Washington Hospital Center ("WHC"). After several of his applications for vacant positions at WHC were turned down, he sued WHC in the United States District Court for the District of Columbia, claiming that WHC in its hiring decisions had discriminated against him on the basis of his age and disability, and that WHC had also violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, ("the ADA") by failing to reasonably accommodate his disability by reassigning him to a vacant position. The district court granted summary judgment to WHC, and Aka appealed; a divided panel of this court vacated the summary judgment as to one of the hiring decisions and as to Aka's reasonable-accommodation claim. At the behest of WHC, we

granted rehearing in banc as to these two claims. We again vacate the original summary judgment on Aka's two claims, though for reasons that differ from the panel's in some respects.

## I. BACKGROUND

Aka, a 56–year-old man born and raised in Nigeria, began working for WHC as an Operating Room Orderly in 1972, two years after he emigrated from Nigeria. His job, which involved transporting patients and medical supplies to and from WHC's operating room, required substantial amounts of heavy lifting and pushing. While working at WHC, Aka earned a college degree from the University of Baltimore, and then a master's degree in business and public administration ("MBPA") in health service management from Southeastern University.

In 1991, after working at WHC for over nineteen years, Aka was hospitalized with heart and circulatory problems. He underwent bypass surgery in November 1991, and spent several months thereafter in rehabilitation. While he was in the hospital, a representative of WHC's personnel department, at the request of a hospital social worker, visited Aka to discuss the possibility of his returning to work. Aka had obtained a medical leave of absence from WHC before his operation, and WHC now arranged for an extension of that leave. Aka was in rehabilitation until April 1992. His doctor then told him he could return to work, with a warning that his job could not involve more than a "light or moderate level of exertion."

Aka's former orderly job did not meet that qualification; thus, Aka asked the hospital to transfer him to a job that was compatible with his medical restrictions.[1] WHC declined to do so, and instead told him that it was his responsibility to review WHC's job postings and to apply for any vacant jobs that interested him. WHC did, however, put Aka on an eighteen-month "job search leave." The applicable collective bargaining agreement ("CBA") provides that qualified WHC employees "will be given preferential

---

1. Aka also explained to WHC that he wished to remain employed at the hospital in some capacity because he had a retirement plan and other benefits which he might lose if he had to leave.

treatment over nonHospital employees in filling bargaining unit vacancies," and also incorporates an additional preference for employees with greater seniority. WHC's decision to place Aka on job search leave meant that Aka could retain these preferences during the leave period.

Aka first applied for a position as a Financial Manager, but was not given an interview. An employee of WHC's personnel department told him to apply for less elevated positions, and specifically suggested the positions of File Clerk and Unit Clerk. Aka followed this advice, and applied in May 1993 for a position as Central Pharmacy Technician, a job that involved a range of clerical tasks associated with filling prescriptions, such as patient census checks, charge processing, and stock replacement. Dr. Ann Breakenridge ("Breakenridge"), WHC's Assistant Director of Pharmacy Clinical Services, interviewed Aka for this job, but hired another hospital employee, Jaime Valenzuela ("Valenzuela"), instead.

In July 1993, four vacancies opened up for File Clerk positions. Aka again applied and was interviewed, but did not get any of the four jobs. Among the four applicants who were hired were two non-WHC employees. Aka, believing that this violated the CBA's requirement that hospital employees be accorded preference in filling empty positions, complained to the union, and the union filed a grievance on behalf of Aka and another hospital employee. While this grievance was in arbitration, WHC admitted its mistake, removed the two non-employees from the File Clerk jobs, and hired two hospital employees instead; it did not, however, hire Aka. Aka then protested that he should have been among those hired, given his greater seniority. The arbitrator ultimately ruled (in November 1994) that WHC's decision not to hire Aka did not violate the CBA. The arbitrator found that Aka met the minimal qualifications for the job, had "excellent" evaluations and "good marks" for his ability to work with peers, and was a "highly intelligent and motivated man" who "could be ex-

pected to grasp the technical aspects of the job quite readily." Nevertheless, he said, the CBA allows WHC to hire less senior applicants if they are more qualified, and the applicants WHC hired for the File Clerk jobs had substantial experience with office work, which Aka did not.

In the meantime, Aka continued to apply for other positions at the hospital, but did not receive interviews for any of them. (He eventually volunteered to do administrative work in various parts of the hospital, but still did not succeed in obtaining a job.) In June 1994, Aka filed suit in the United States District Court for the District of Columbia. He claimed that WHC's failure to place him in the Central Pharmacy Technician or File Clerk jobs constituted discrimination on the basis of his disability and age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34 (1994), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (1994).[2]

WHC initially moved to dismiss the complaint, arguing that Aka was required to exhaust the CBA's grievance procedures; this motion was denied. Then, after discovery, WHC moved for summary judgment as to Aka's disparate treatment claims, which invoke WHC's failure to hire him for any of the jobs he applied for; the district court granted this motion. Aka cross-moved for summary judgment as to WHC's failure to reasonably accommodate his disability, asserting that, under the ADA, WHC was obliged to reassign him to a vacant position for which he was qualified and which he could perform despite his disability. As to his reasonable-accommodation claim, the district court concluded that the CBA barred WHC from reassigning disabled employees outside of the usual job-application process provided for in the CBA, and that any reassignment obligation under the ADA must give way if it conflicts with other employees' rights under the CBA. The district court thus granted summary judgment to WHC on this issue as well.

**2.** Aka originally also claimed that WHC had (1) discriminated against him on the basis of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et

seq. (1994), and (2) violated the District of Columbia Family and Medical Leave Act, D.C.Code Ann. § 36–1301 et. seq. He has subsequently dropped these claims.

Aka appealed the denial of both the ADEA and the ADA claims. A panel of this court concluded that the district court had correctly granted summary judgment to WHC as to Aka's disparate-treatment claim based on the File Clerk hiring decisions. As to the remainder of Aka's claims, the panel was in disagreement. The majority reversed and remanded as to the grant of summary judgment to WHC on (1) Aka's disparate-treatment claim based on the Central Pharmacy Technician hiring decision and (2) Aka's reasonable-accommodation claim. The dissent would have affirmed as to the first of these claims, and would have remanded on different grounds as to the second. WHC moved for rehearing in banc as to these two rulings, which was granted. (Neither WHC nor Aka asked that the panel's holding as to the File Clerk positions be reheard in banc, so that the panel's ruling on that issue stands.) We conclude that it was error for the district court to grant summary judgment to WHC as to Aka's Central Pharmacy Technician disparate-treatment claim and as to his reasonable-accommodation claim.

## II. ANALYSIS

The principles of summary judgment are sufficiently familiar as to require only brief restatement. We review grants of summary judgment *de novo*; a party is only entitled to summary judgment if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). "[S]ummary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In addition to his age discrimination claim, Aka in effect makes two distinct disability discrimination claims. The first is based on

the theory that WHC engaged in disparate treatment in declining to hire him for the Pharmacy Technician position; the second, on the theory that WHC discriminated against him in declining to grant him the reasonable accommodation of reassignment to a vacant position once he became disabled. We will first analyze Aka's disparate treatment disability discrimination claim (together with his age discrimination claim) under the familiar three-part protocol set forth by the Supreme Court in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995) (finding that the *McDonnell–Douglas* framework applies to ADA cases); *see also Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993) (finding that in cases under a related statute, the Rehabilitation Act, it is appropriate to apply the *McDonnell–Douglas* framework to claims that an employer has acted with discriminatory intent). We then consider Aka's reasonable-accommodation claim, which is not subject to analysis under *McDonnell–Douglas*, but has its own specialized legal standards. *Cf. Barth*, 2 F.3d at 1186 (drawing a similar distinction under the Rehabilitation Act).

### A. *Disparate Treatment*

Under the *McDonnell–Douglas* framework, the complainant must first establish a *prima facie* case of prohibited discrimination. *See McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Once he has done so, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision. *See id.* Should the employer succeed in presenting such reasons, the burden then shifts back to the complainant, who then has an opportunity to discredit the employer's explanation. *See id.* at 804–05, 93 S.Ct. 1817.[3] In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67

---

**3.** *McDonnell–Douglas* actually said the employee "must ... be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." 411 U.S. at 804, 93 S.Ct. 1817. The term "pretext" can be slippery; sometimes it means that an employer's explanation is incorrect, and sometimes it means both that the explanation is incorrect *and* that

the employer's real reason was discriminatory. (As we explain below, the plaintiff's ultimate obligation, under *McDonnell–Douglas* and its progeny, is to show the latter.) We will avoid using the term "pretext," and instead refer (as appropriate) to evidence that the employer's explanation is false, that it is a lie, or that the employer's real motivation was discriminatory.

L.Ed.2d 207 (1981), the Court held that, in producing nondiscriminatory reasons for its challenged action, the employer is not obligated to support these reasons with objective evidence sufficient to satisfy the "preponderance of the evidence" standard, *see id.* at 259–60, and that the plaintiff at all times retains the ultimate burden of persuasion. *See id.* at 253.

The Court elaborated further on the *McDonnell-Douglas* framework in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In that case, the plaintiff, Melvin Hicks, claimed that he had been fired because of his race. The district court found, after a bench trial, that he made out a *prima facie* case and the reasons proffered by the employer for firing Hicks were not its real reasons; the court concluded, however, that other evidence undercut the employee's claim that the firing was motivated by discrimination. The Eighth Circuit reversed, ruling that once the district court had found that the employer's proffered reasons for its decision were incorrect, there was no need to go further, and Hicks was entitled to judgment in his favor. The Supreme Court disagreed, holding that a plaintiff who discredits the employer's stated reasons for its employment decision is not necessarily entitled to judgment in his favor as a matter of law.

■ We review *Hicks* in some detail, as the Court's most recent explication of the workings of the *McDonnell–Douglas* framework. *Hicks* made clear that the function of the *prima facie* case is to compel the employer to " 'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.' " *Id.* at 507, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089). Once the employer has done so, "the presumption [of discrimination] raised by the prima facie case is rebutted," and "drops from the case." *Id.* (quoting *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. 1089). Then, the plaintiff has " 'the full and fair opportunity to demonstrate,' through

presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race [or some other discriminatory basis] was." *Id.* at 507–08, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089) (citation omitted).

■ Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment). That is not to say that every plaintiff must always present evidence in each of these categories in order to avoid summary judgment.[4] In this case, Aka has presented evidence in the first two categories, but neither Aka nor WHC has presented any evidence in the third. We are therefore faced with the issue of when evidence in categories (1) and (2) alone can suffice to support a jury verdict for the plaintiff, or, as in this case, to prevent summary judgment for the defendant.

A number of circuit courts have cited *Hicks* for the proposition that a plaintiff can always succeed in fending off summary judgment if he can demonstrate a genuine issue of material fact as to whether the employer's stated reason for its employment decision is the real reason. *See, e.g., Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1066–72 (3d Cir.1996) (in banc); *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 342–47 (6th Cir.1997); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1123–24 (7th Cir.

---

4. Indeed, *Burdine* said that in some cases the plaintiff may be able to prevail on the basis of his initial *prima facie* case alone, "combined with effective cross-examination of the defendant."

*Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089. This suggests that a *prima facie* case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment.

1994); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993); *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). Other circuit courts have disagreed with this reading of *Hicks,* saying that there are at least some situations in which genuine issues of material fact as to the falsity of the employer's explanation will not suffice alone to avoid summary judgment. *See, e.g., Hidalgo v. Overseas Condado Insurance Agencies, Inc.,* 120 F.3d 328, 335–37 (1st Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1335–38 (2d Cir.1997) (in banc);[5] *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (in banc); *Ryther v. KARE 11,* 108 F.3d 832, 836–37 (8th Cir.1997) (in banc).

■■■■ We ourselves do not read *Hicks* to say that a plaintiff who creates a genuine issue of material fact as to whether the employer has given the real reason for its employment decision will *always* be deemed to have presented enough evidence to survive summary judgment. Instead, the court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered discrimination and accordingly summary judgment is inappropriate. Under *Hicks* and other applicable law, however, a plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight. As we will explain, we therefore reject any reading of *Hicks* under which employment discrimination plaintiffs would be routinely required to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.

### 1. *The meaning of* Hicks

The principal support for the proposition that a plaintiff can always avoid summary judgment by creating a genuine issue of material fact as to whether the employer's stated reason for its employment decision is the true reason derives from the following passage in *Hicks*:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, no additional proof of discrimination is *required.* But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule [of Evidence] 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'

---

[4] Contrary to the dissent's confusion-producing analysis, there is nothing whatsoever inconsistent between this statement and our later statements that (1) the plaintiff must show *"both* that the reason was false, *and* that discrimination was the real reason," and (2) "it is not enough ... to *dis*believe the employer." Even

(emphasis added). Neither our decision, nor that of the Second Circuit is in conflict with Judge Silberman's view that the prima facie case "is only a burden of production shifting device," *infra* at 4 (Silberman, J., dissenting). Indeed, we make precisely the same point in our description of the *McDonnell–Douglas* framework, *supra* at 8; as we explain below, once the burden-shifting process is complete, the evidence constituting the prima facie case is then weighed, together with the parties' other evidence, according to ordinary evidentiary principles. *See infra* § II.A.2. In sum, neither our decision, nor that in *Fisher,* "amounts, *de facto,* to a broad 'wrongful discharge' cause of action for a plaintiff in a protected class," *infra* at 3 (Silberman, J., dissenting).

---

5. We do not see the difference that Judge Silberman discerns between our approach and that of the Second Circuit in *Fisher.* To the contrary we view our approach as in accord with that of our Second Circuit colleagues. *Fisher* holds that "evidence constituting a prima facie case prior to the employer's proffer of a reason, coupled with the error or falsity of the employer's proffered reason may—or may not—be sufficient to show illegal discrimination by a preponderance of the evidence." 114 F.3d at 1333. *Fisher* further holds that "the fact that the proffered reason was false does not *necessarily* mean that the true motive was the illegal one argued by the plaintiff.... The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case." *Id.* at 1338

though (as we say here) rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination.*

*Hicks,* 509 U.S. at 511, 113 S.Ct. 2742 (emphasis and ellipsis in original) (citations omitted). Certainly, this passage indicates at a minimum that a factfinder's reasonable rejection of the defendant's proffered explanation will support an inference of discrimination. But this passage can be and has been read by some courts to go further, proclaiming that if the jury can reasonably reject the defendant's proffered reason, no additional proof of discrimination is ever "required." *See, e.g., Anderson,* 13 F.3d at 1123–24; *Washington,* 10 F.3d at 1433. For reasons discussed below, common sense compels us to reject so broad a reading. The Court's every word and sentence cannot be read in a vacuum; its pronouncements must be read in light of the holding of the case and to the degree possible, so as to be consistent with the Court's apparent intentions and with other language in the same opinion. As the Court itself cautions elsewhere in *Hicks,* "we think it generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code." *Id.* at 515, 113 S.Ct. 2742.

Two examples illustrate why we believe an unqualifiedly literal reading of this passage of *Hicks* would not carry out the Court's true purpose. First, let us consider a case in which the plaintiff calls the employer's explanation into question, but does so in a way that conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation. For instance, in *Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328 (8th Cir. 1996), the plaintiff claimed that he had been fired because of his age. When his former employer came forward with a number of nondiscriminatory explanations, including insubordination, the plaintiff responded with evidence that in fact the real reason he had been discharged was that he had discovered that his firm was not in compliance with Securities and Exchange Commission rules and his employer wished to cover the problem up—a contention that the panel rightly

concluded undercut the plaintiff's own claim of age discrimination. *See id.* at 1337–38; *cf. Hazen Paper v. Biggins,* 507 U.S. 604, 613, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that "inferring age motivation from the implausibility of the employer's explanation may be problematic in cases where other unsavory motives, such as pension interference, were present."). If a plaintiff shoots himself in the foot, surely there is no point in sending the case to the jury. *See also Visser v. Packer Engineering Assoc.,* 924 F.2d 655, 657 (7th Cir.1991) (in banc) (observing that a plaintiff's evidence that he was fired because he was a whistleblower does not tend to show discrimination, and "tends if anything to show the opposite").

Second, there may be no legitimate jury question as to discrimination in a case in which a plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record that no discrimination has occurred. The *Hicks* Court cited the example of a situation in which the hiring officer, as well as 40% of the employer's work force, were members of the same minority group as the plaintiff (even though the group in question comprised only 10% of the relevant labor market). *See Hicks,* 509 U.S. at 513, 113 S.Ct. 2742. Where an employer has a strong record of equal opportunity employment, any inference of discrimination arising from the discrediting of the employer's explanation may be a weak one, and in some cases not strong enough to let a reasonable factfinder conclude that discrimination has occurred at all.

Accordingly, as we read *Hicks,* the plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case; in some instances, as we have pointed out, the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination. It is obviously impossible to provide an exhaustive list of such situations. In the next section, however, we discuss the (often great) evidentiary weight to be accorded to the plaintiff's exposure of the defendant's

excuse as false, an analysis that will assist in determining whether a particular showing suffices to permit an inference of discrimination.

Although we find that rebuttal evidence alone will not always suffice to permit an inference of discrimination, we do not endorse a reading of *Hicks* under which employment discrimination plaintiffs are presumptively required to submit evidence over and above such a rebuttal in order to avoid summary judgment. An example of a case adopting the latter approach is *Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328 (1st Cir.1997). In *Hidalgo*, the First Circuit assumed for purposes of its decision that an age-discrimination plaintiff had raised a triable issue as to whether the employer's explanation was incorrect,[6] but nevertheless concluded that because the plaintiff had "offered no evidence that reasonably could be construed to indicate that [the employer] intended to discriminate against him because of his age," it was appropriate to grant summary judgment for the defendant. *Id.* at 337. As we have said, the circumstances of some cases may render evidence undercutting the employer's explanation insufficient to infer discrimination; but *Hidalgo*, rather than explaining why the showing in that case fell short, simply said that the plaintiff had offered "no" evidence of intentional discrimination, without addressing the significance of the plaintiff's case at all. This suggests that the *Hidalgo* court believed that employment-discrimination plaintiffs must as a routine matter do more than discredit the employer's explanation in order to avoid summary judgment. That assumption we think would be inconsistent with *Hicks*, which makes clear that "no additional proof of discrimination is required" as a matter of course once a plaintiff has shown

that a jury could reject the employer's proffered explanation. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742; *see also Rothmeier*, 85 F.3d at 1333–35 (reading *Hicks* to reject an approach under which a showing that the defendant's proffered explanation is false is presumptively insufficient to show discrimination); *Anderson*, 13 F.3d at 1123 (same);[7] *cf. Rhodes*, 75 F.3d at 993 (saying that evidence showing the employer's explanation to be false, standing alone, will "ordinarily" permit an inference of discrimination). Our reading of *Hicks* also accords with the Supreme Court's rule, set forth in *United States Postal Serv. v. Aikens*, 460 U.S. 711, 714 n. 3, 717, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), that it is improper to require plaintiffs to produce direct evidence of discriminatory intent in order to prevail at trial.

### 2. The weight to be assigned to the plaintiff's rebuttal

Although the plaintiff cannot always avoid summary judgment by showing the employer's explanation to be false, we read *Hicks* (and other relevant caselaw) to mean that such a showing does have considerable evidentiary significance. First, when the plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's actions. Events have causes; if the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination. As the Court said in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978):

> A prima facie case under *McDonnell–Douglas* raises an inference of discrimination only because we presume these

---

**6.** *Hidalgo* actually uses the term "pretext." *Id.* at 337. In context, it is apparent that the court meant this term in the sense of "incorrect."

**7.** Both *Anderson* and *Rothmeier* make this point by saying that *Hicks* rejected the so-called "pretext-plus" standard that had been applied by some circuit courts. We have not used the term "pretext-plus," as it obscures the distinction between (1) requiring that plaintiffs both discredit the employer's explanation *and* show discrimination, and (2) presumptively requiring that plain-

tiffs provide more than discrediting evidence alone in order to show discrimination. Both *Anderson* and *Rothmeier* read *Hicks*, as do we, to adopt the first of these two approaches, but reject the second. *See generally* Catherine J. Lanctot, *The Defendant Lies and the Plaintiff Loses: The Fallacy of the "Pretext–Plus" Rule in Employment Discrimination Cases*, 43 Hastings L.J. 57 (1991) (explaining why it is inappropriate routinely to require plaintiffs to adduce more evidence than rebuttal evidence alone).

acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration such as race.

*Id.* at 577, 98 S.Ct. 2943 (citations omitted). In this passage the Court was explaining why it is permissible to grant judgment for the plaintiff on the basis of an unrebutted *prima facie* case: because, in the absence of a legitimate explanation, we infer the existence of an illegitimate one. Similarly when the plaintiff has discredited the employer's explanation for its acts, and no other plausible explanation is readily at hand, *Furnco*'s logic would seem to apply as well, and to at least permit (if not compel, as in *Furnco*) an inference of discrimination in an appropriate case.

If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. As *Hicks* said, "[t]he factfinder's disbelief of the reasons put forward by the defendant (*particularly if disbelief is accompanied by a suspicion of mendacity*) may, together with the elements of the prima facie case, suffice to show intentional discrimination." 509 U.S. at 511, 113 S.Ct. 2742 (emphasis added). This is so because, according to ordinary evidentiary principles (which we have been instructed to apply in employment discrimination cases, *see Aikens,* 460 U.S. at 716, 103 S.Ct. 1478), a lie is evidence of consciousness of guilt. The jury can conclude that an employer who fabricates a false explanation has something to hide; that "something" may well be discriminatory intent. *See Shager v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990) ("If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a

forbidden one ... may rationally be drawn"); *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir.1997).

Such an inference is of course in line with how evidence of consciousness of guilt is treated in other cases, criminal or civil. An employer that concocts a false explanation for an employment decision is in a like position to a criminal defendant who offers a false alibi: the jury may consider the fact that the defendant has presented a false alibi in deciding his guilt. *See United States v. Hughes,* 716 F.2d 234, 240–41 (4th Cir.1983); *United States v. Zang,* 703 F.2d 1186, 1191 (10th Cir.1982). In this circuit, we have repeatedly treated false statements by a defendant as credible evidence of consciousness of guilt. *See, e.g., United States v. Morgan,* 914 F.2d 272, 276 (D.C.Cir.1990) (per curiam) (citing a defendant's lie about possessing a claim check for a suitcase containing drugs in assessing the sufficiency of the evidence); *see also United States v. Johnson,* 46 F.3d 1166, 1171 (D.C.Cir.1995) (finding it appropriate to admit as evidence of consciousness of guilt a drug defendant's false claim, made to explain the source of his income, that he worked at a sporting goods store).

Of course, as the Court explained in *Hicks,* an employer's lie does not automatically entitle the plaintiff to judgment as a matter of law. But *Hicks* also made plain that a lie "carries substantial risks," including the risk of sanctions, *Hicks,* 509 U.S. at 521–22, 113 S.Ct. 2742, and the more mundane risk that the lie will lead the jury to draw an adverse inference. Indeed, the employer's fear that the jury will draw an adverse inference from a false explanation is a vital element of the *McDonnell–Douglas* burden-shifting procedure. Without it, employers would have little incentive to look for and present the real reasons for their employment decisions, undercutting the purpose of the *McDonnell–Douglas* framework, which is "to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring); *see also TWA v.*

*Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).[8]

■ To summarize, we can do no better than to quote *Hicks* once more. In an appropriate case, "[t]he factfinder's disbelief of the reasons put forward by the defendant" will allow it to infer intentional discrimination. 509 U.S. at 511, 113 S.Ct. 2742. (As we observe above, it is difficult, if not impossible, to say in any concise or generic way under what precise circumstances such an inference will be inappropriate.[9]) If "disbelief is accompanied by a suspicion of mendacity," *id.,* the likelihood of intentional discrimination is increased, permitting thefactfinder to infer discrimination more readily.

### 3. *The evidence in this case*

■ The conflict of evidence in Aka's case involves, in large part, a dispute over job qualifications, his and those of the successful contender for the Pharmacy Technician job. WHC claims that it hired Valenzuela because he was more qualified than Aka. Aka replies that WHC is mistaken as to their comparative qualifications, and that it was he, Aka, who was more qualified for the position.

8. The dissent observes that an employer may offer a lie to explain its actions, not because it has discriminated but because it wishes to conceal an "embarrassing, albeit lawful" motive, or "to spare the feelings of an employee he considered unsatisfactory in performance." Dissenting opinion at 1307 n.3. Possibly; but the fact that a lie could have multiple explanations, some of them well-intentioned, cannot and should not foreclose the finder of fact, after hearing witness testimony and assessing the evidence as a whole, from deciding that the real motivation for lying was not innocent, but discriminatory. (This is subject, of course, to the ability of the courts to review any factual findings. *See Hicks,* 509 U.S. at 524, 113 S.Ct. 2742.)

9. Our dissenting colleagues cite this acknowledgement in accusing us of advancing a "framework (if one can call it that) that is both devoid of intelligible standards and incompatible with the principle that the plaintiff bears the burden of proof on the ultimate fact." Dissenting opinion at 1309. But the task of assessing whether a plaintiff has presented enough evidence to permit an inference of discriminatory intent is, as the author of the dissent herself observed in her panel dissent, "intensely fact bound." *See Aka v. Washington Hospital Center,* 116 F.3d 876,

In cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone. In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call. *Cf. Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997). But this does not mean that a reasonable juror would in every case defer to the employer's assessment. If that were so, no job discrimination case could ever go to trial. If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.[10]

899 (D.C.Cir.1997) (Henderson, J., dissenting). Accordingly we have limited ourselves to identifying the general principles that govern the plaintiff's burden on summary judgment and to providing a detailed application of those principles to this case. The dissent appears to offer no analytical framework of its own. Because the Supreme Court has made clear that it is improper to require direct proof of discriminatory intent, *see Aikens,* 460 U.S. at 714 n. 3, 717, 103 S.Ct. 1478, it must be possible for a plaintiff to survive summary judgment in some cases by showing that the defendant's explanation is a lie. The dissent conspicuously fails, however, to identify those cases in which such an inference is possible and those in which it is not. And as to the dissent's claim that our approach is "incompatible with the principle that the plaintiff bears the burden of proof on the ultimate fact," our entire analysis focuses on the precise question of when a jury might reasonably conclude that the plaintiff's evidence suffices to meet that burden.

10. An employer may of course select a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview. We discuss such subjective considerations below.

A plaintiff attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of the successful candidate. The plaintiff can instead seek to expose other flaws in the employer's explanation. For example, the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision. Or a plaintiff can attempt to show that the employer's explanation misstates the candidates' qualifications. Thus, if the employer says that it did not hire the plaintiff because he did not speak Portuguese, the plaintiff can show that he *did* speak Portuguese, and that the employer knew it. Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination.[11]

A review of the evidence in this case reveals that a reasonable factfinder could conclude both that the balance of qualifications weighed markedly in Aka's favor, and that there was other evidence calling WHC's explanation into question. Viewing the evidence "as favorably to [Aka] as reason will permit," *Shager*, 913 F.2d at 401, as we are obligated to do at summary judgment, we find that the evidence suffices for a reasonable factfinder to infer discrimination. We begin with a review of Aka's and Valenzuela's qualifications for the Central Pharmacy Technician position, and then turn to other evidence calling WHC's explanation into question.

### a. *Aka's and Valenzuela's Qualifications*

WHC's official "position specification" form listed two qualifications for the job, "previous hospital experience in pharmacy services" and "knowledge of medical terminology." The listed job responsibilities are quite varied, and include accepting drug and narcotic orders, distributing medications, answering questions and giving directions to the public, maintaining narcotic control records and inventory books, performing "charging" (that is, billing) functions, stocking pharmaceutical and IV supplies, performing patient census checks, "evaluating, processing, and filling drug stock orders for satellite pharmacies," and "monitoring the pharmacy's extemporaneous pre-pack list to identify items that should be pre-packaged."[12]

Aka's application form for the Central Pharmacy Technician position listed his current position, "OR Orderly," his hire date, August 6, 1972, and the highest degree he held, his MBPA in health service management. Aka was interviewed by Dr. Ann Breakenridge, WHC's Assistant Director of Pharmacy Clinical Services. After the interview, Breakenridge wrote on a WHC Interview Summary Report form: "Mr. Aka is a longstanding WHC employee on MLOA [medical leave of absence]. Performed duties in the OR with some exposure to minimal pharmacy functions." Her assessment of Aka states: "Mr. Aka has no skills which will be helpful as a pharmacy technician. He is aware of the drug delivery aspect of the job which is a minor part of the technician responsibilities. Schedule [illegible] responsibilities [illegible]. Mr. Aka's MBPA degree could be best utilized in other areas of the hospital." In a later affidavit, she added that Aka had displayed no "enthusiasm" during the interview, and said "[i]ndeed he told me that he really was not interested in doing pharmacy work." Aka denies saying this.

Valenzuela's application form said that he did not have a college degree, and that he had been working at the hospital laundry for slightly over a year; he listed his duties as "prepare clean linen for delivery," and said "when needed, I work in the folding machines and ironer." Valenzuela also said:

---

**11.** As we have already said, the plaintiff is not limited to challenging the employer's explanation, but can also avoid summary judgment (and prevail at trial) by presenting other evidence, either direct or circumstantial, that permits an inference of discrimination. *See Wallace*, 103 F.3d at 1397. For instance, if a female plaintiff claims sex discrimination, evidence that the defendant employs women at rates far below their numbers in the applicant pool and the general population may well help her case.

**12.** The last three of these items are not on the official list of job responsibilities that appears in the record, but are listed as responsibilities in Breakenridge's affidavit.

"For two months I worked as volunteer in Asco Pharmacy. My duties are pricing, stocking, filling up cassettes. I pick up and deliver medicine from nursing units."[13]

In explaining her decision to hire Valenzuela instead of Aka, Breakenridge cited Valenzuela's experience in pharmacy services, his knowledge of medical terminology, and his greater enthusiasm. We will begin by discussing the more objective aspects of the candidates' qualifications, and then turn to the question of their relative enthusiasm.

i. *Pharmacy experience.* Valenzuela's pharmacy experience was limited to two months of part-time volunteer work. It is unclear how much time Valenzuela volunteered, as he apparently continued to work full-time at the hospital. There is no evidence that the volunteer work occurred in a hospital, as the WHC position specification form required; "Asco" Pharmacy does not suggest a hospital. His work involved: (1) "pricing" medication, not a task listed in the Pharmacy Technician job description; (2) delivering medication to nursing stations, something Aka also did; and (3) "stocking" and "filling up cassettes," which (assuming that "cassettes" are medicine containers) appear to correspond to a single item in the job description, "receive, count and store pharmaceutical supplies."

Aka on the other hand had spent nineteen years picking up medicine and IV solutions from the central pharmacy for delivery at the OR. As Aka describes this work, it was not limited to picking up materials at a counter, but required him to move around within the pharmacy; pharmacy staff would show Aka the section of the pharmacy in which the item he wanted could be found, and he knew "where to pick it up." As Aka pointed out at his deposition, this meant that he effectively already knew how to move materials within the pharmacy itself:

> My experience was while working as an orderly, they used to send me to the pharmacy to pick up medication needed in O.R. When I go there, they show me the section [where] [t]hey put medication for O.R. I know where to pick it up.... *So I can take that as experience in taking medication to any section of the unit if they need it.*

Appendix at 129 (emphasis added).[14]

A reasonable jury could find that Aka's ability to do the less skilled parts of the pharmacy job was at least comparable to Valenzuela's. Aka had been moving and handling pharmacy supplies for nineteen years, and knew the layout and routines at WHC's pharmacy. It would not have taken him long to pick up whatever stocking skills Valenzuela learned during his short stint of

13. His application form also said that he had worked for a total of six years as a courier, and for six months doing building and ground maintenance.

14. Aka adds in an affidavit that he was also "regularly assigned" to "stock medications in the nurses work area, and even sometimes prepare orders for medications that were not in sufficient stock in the nurses work area," and "had extensive knowledge and background with the forms used by [the] pharmacy for filling medications." WHC argues that because Aka did not specifically mention this experience at his deposition, he should not be able to raise it in a later affidavit. Aka was asked at his deposition: "Is my understanding of your testimony correct, that your experience in pharmacy services consists of transporting narcotics and drugs to and from the pharmacy," and answered "Yes"; counsel for WHC then asked "Is there any more experience that you had, other than that?" and Aka said "No other experience." It is not clear that Aka's later affidavit necessarily contradicts this testimony. It may be that the broad task of transporting medications which Aka mentioned at his deposition includes the sub-tasks of preparing an order form, then going to get the medications, and then stocking them in the nurses' work area. Or it may be that when Aka was asked about his "experience in pharmacy services," he described only the work he had done directly in a pharmacy, and not all of the pharmacy-related work he had ever done. As we explained in *Pyramid Securities, Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C.Cir.1991), although the courts frown on a party's attempt to contradict previous testimony at summary judgment, "persuasive reasons" for a correction are "more likely to be available where the initial statement took the form of a deposition rather than [as in *Pyramid Securities*] an affidavit. A deponent may have been confused about what was being asked or have lacked immediate access to material documents." *Id.* at 1123 (citation omitted). In any event, because it is not clear on the present record that Breakenridge knew about Aka's involvement in stocking or ordering pharmaceuticals, we do not rely on these elements of Aka's affidavit.

volunteer work. Valenzuela would likewise have needed some time to learn his way around WHC's pharmacy (and hospital pharmacies generally).

As to the more skilled parts of the pharmacy job, like billing, accounting, tracking drugs and patients, and planning pharmacy operations, Aka had a very strong advantage. Aka's master's degree in business and professional administration, with a concentration in health service management, would presumably have been very helpful with these tasks.[15] Valenzuela, by contrast, did not even have a college degree. Moreover, Aka had worked directly with patients at WHC for nineteen years, and so would have been familiar with many of the relevant hospital procedures.[16] Valenzuela, with his year working in the hospital laundry, could not make this claim.

ii. *Medical terminology.* Breakenridge also cited Valenzuela's knowledge of medical terminology, derived "from a job that he had held at Metpath, a medical laboratory." That job lasted somewhat over a year, and involved picking up medical specimens from nursing homes and doctors' offices and delivering them to a lab for analysis.

Aka says in his affidavit that, during his many years of work as an orderly, "my duties ... required me to work closely with the health care personnel servicing patients," and he "knew how most of the medications were used by nurses in their care of patients." (Aka does not claim that he knew what considerations *doctors* took into account in prescribing medication, which would be implausible, but only how *nurses* administered them.) Aka thus had nineteen years of close experience with the administration of medications, and probably knew (for instance) the name and general function of many medications, and that certain of the medications were dangerous or required special handling. It is not clear whether Aka mentioned his familiarity with the uses of medications at his job interview. But Breakenridge, whose title was Assistant Director of Pharmacy Clinical Services, presumably knew enough about the functioning of the hospital to be aware that a highly experienced orderly would frequently see medications being used.[17]

A reasonable juror could conclude that Valenzuela would have learned much less of the medical terminology relevant to the pharmacy job in his year at Metpath than Aka did in his nineteen years at WHC. Not only was Valenzuela's work experience shorter, but Valenzuela was handling medical specimens, while Aka was working directly with drugs.

iii. *Enthusiasm.* Considerations of enthusiasm aside, a reasonable juror could therefore find that Aka was significantly better qualified than Valenzuela for the pharmacy job. This leaves Breakenridge's conclusion that Valenzuela was a highly enthusiastic candidate, and that Aka was not. There is evidence in the record to support the conclusion that each of the two candidates was enthusiastic. Valenzuela's pharmacy volunteer work points to enthusiasm (perhaps more than to actual experience). Breakenridge also noted that Valenzuela had applied

15. The dissenters give no weight to Aka's superior education because there were no educational prerequisites listed in the job description. Dissenting opinion at 1309–10. But reasonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job.

16. The job description for Aka's orderly job lists a broad range of responsibilities, including transporting patients, maintaining equipment in clean and operational order, and performing "clinical support activities," such as administering procedures, assisting with specimen collection, and patient preparation—all work that would have provided Aka with important background knowledge on the functioning of the hospital. Breakenridge, a fairly senior hospital employee, would presumably have been familiar with this spectrum of duties.

17. When WHC asked him at his deposition about his pharmacy experience, Aka did not mention his knowledge of the uses of medications. *See supra* note 14. But he could not have been expected to do so, just as someone asked about his experience working in hardware stores would not necessarily be expected to talk about his extensive experience with the proper use of tools. In any case, we are principally concerned here with the candidates' knowledge of medical terminology, not their pharmacy experience.

for the pharmacy job once before and been rejected, so that he had demonstrated some previous interest in the job.[18]

Aka claims that he, too, expressed enthusiasm at his interview (contradicting Breakenridge's claim that he said that he did not want the job). A juror could find that the circumstances corroborate this claim. Aka had earned two degrees while working a full-time job, and was described by the arbitrator adjudicating the dispute over the File Clerk jobs as a "highly intelligent and motivated man." He applied for numerous jobs at WHC, despite being repeatedly turned down; indeed, in early 1995 he started volunteering in administrative jobs in various parts of the hospital, in an effort to enhance his chances of being hired.

Of course, even if Aka *was* truly enthusiastic about the job, Breakenridge could still have subjectively concluded that he showed, in her words, "no enthusiasm for or interest in the Pharmacy Technician job." However, we are reluctant to give this possibility too much weight at summary judgment. First, Breakenridge did not comment at all on Aka's enthusiasm (or the lack thereof) on the interview summary sheet, weakening her claim that Aka's lack of enthusiasm motivated her decision.

Furthermore, although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution. Particularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant, an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination. Indeed, we observed in *Fischbach v.*

*D.C. Department of Corrections,* 86 F.3d 1180, 1184 (D.C.Cir.1996), that an employer's heavy use of "highly subjective" criteria, such as "interpersonal skills," could support an inference of discrimination. *See generally Perfetti v. First Nat. Bank of Chicago,* 950 F.2d 449, 457 (7th Cir.1991) (discussing "the ease with which employers may use subjective factors to camouflage discrimination") (citation omitted); *Lilly v. Harris–Teeter Supermarket,* 842 F.2d 1496, 1506 (4th Cir. 1988); Mark S. Brodin, *The Demise of Circumstantial Proof in Employment Discrimination Litigation:* St. Mary's Honor Center v. Hicks, *Pretext, and the "Personality" Excuse,* 18 BERK. J. EMP. LAB. L. 183, 218–24 (1997) (discussing the difficulties presented by the "personality" rationale for employment decisions). Moreover, we cannot altogether ignore the fact that outward manifestations of "enthusiasm" are just the kind of traits that advancing age and heart-related disability may tend to diminish.[19]

An employer's reliance on disputed subjective assessments will not create a jury issue in every employment discrimination case. For example, if this reliance is modest, and the employer has other, well-founded reasons for the employment decision, summary judgment for the defendant may be appropriate. Here, however, a jury could find that Aka was in all other respects markedly better qualified for the job. A reasonable jury might still credit Breakenridge's claim that Aka "displayed no enthusiasm for or interest in the Pharmacy Technician job," and hence find that no discrimination occurred. But a jury might also decide after assessing Breakenridge's and Aka's credibility that Breakenridge's claim was untrue—indeed, a lie. This would, in turn, raise a strong inference of discriminatory intent, an inference that

---

18. Actually, Breakenridge's affidavit said that it was "Plaintiff"—Aka—who had previously applied for the pharmacy job and been turned down. Aka does not make this claim in his affidavit, however, and in context it seems likely that Breakenridge meant to refer to Valenzuela, who is otherwise the subject of the relevant paragraph. The principle we articulated in *Pyramid Securities* that on summary judgment a party is strictly held to her words in an affidavit does not necessarily mean that a party is bound by even a slip of the pen.

19. The dissent complains that Aka has offered no evidence that he was more enthusiastic than Valenzuela at the interview. Dissenting opinion at 1310. It would be difficult to offer any such evidence, in the absence of a videotape of the interview. Under the dissent's approach, an employer could defeat any employment discrimination claim by a job applicant by citing the interviewer's subjective assessment that he was less enthusiastic than some other candidate.

would not be undercut by any other facts in this case.

This case thus turns on whose account of Breakenridge's interview with Aka is correct; that question will hinge on Aka's and Breakenridge's credibility, an issue that is quintessentially one for the finder of fact. "Determining the weight and credibility of witness testimony ... has long been held to be the 'part of every case that belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" *United States v. Scheffer*, —— U.S. ——, ——, 118 S.Ct. 1261, 1266, 140 L.Ed.2d 413 (1998) (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891)).

b. *Other evidence of discrimination*

As we have said, an employment discrimination plaintiff is not limited to arguing that the employer's explanation is wrong on the merits, but he can also attempt to show by other means that the explanation was made up to disguise illegitimate bias. There is some evidence from which an inference of that kind could be drawn in this case.

A juror might conclude from the record that Breakenridge did not compare Aka's and Valenzuela's qualifications (in the way we do above) and decide that comparatively Valenzuela was the better candidate, but rather she decided not to hire Aka immediately after his interview, before she had even seen Valenzuela. On the interview summary sheet for Aka's interview, she checked both the box for "not interested in this individual" and the box for "will consider with other applicants." More tellingly, she wrote in her summary that Aka had "no skills which will be helpful as a pharmacy technician," and that his "MBPA degree could be best utilized in other areas of the hospital." It is hard to see how an interviewer could conclude that Aka had *no* skills that would be helpful as a pharmacy technician; for instance, his MBPA was certainly relevant to the accounting and billing work the job entailed. This notation suggests that for some reason Breakenridge came away from her interview with Aka with a strong aversion to employing him, an aversion that colored her summary of Aka's qualifications.[20] This aversion may have had some reasonable basis (such as Aka's asserted lack of enthusiasm), or it might have been rooted in bias (a perception that Aka was too old, or too disabled, to make a good employee).[21]

Moreover, Breakenridge claimed in a later affidavit that Aka had told her during his job interview that he did not really want the pharmacy technician job. Aka denies having said this; there is thus a genuine issue of material fact on this point alone. If Aka did say this, it is strange that Breakenridge did not note that fact on the interview summary sheet. An interviewer explaining why a candidate was not hired would ordinarily take note of the fact that he has virtually withdrawn his application. In a jury's eyes, this omission might also count as evidence that Breakenridge's account of the interview was invented after the fact.

In summary, we think that there is sufficient evidence in the record so that a reasonable jury could conclude that Aka was markedly more qualified than Valenzuela was, thus throwing into doubt the reason given for his rejection. Aka, after all, was a 19–year employee with a good record who had earned two degrees while on the job—yet after his bypass surgery he lost out to an applicant who had worked at the hospital for less than a year as a laundry-folder. Indeed, not only

**20.** It is noteworthy that, while it took WHC two weeks to even grant Aka an interview, Valenzuela *seems to have been* hired the day after he applied. (There is no indication in the record that any other WHC employees applied for the job.) WHC received Valenzuela's application nine days after Aka was interviewed, on May 26. On May 27, WHC's personnel department made a notation on Aka's application that he had not been selected for the Pharmacy Technician position. The handwritten dates May 27 and May 28 also appear (without explanation) in the portion of Valenzuela's application form reserved for notes by recruitment staff, *suggesting that this is* when he was hired.

**21.** The interview summary sheet reveals that Breakenridge was aware of Aka's age and disability. In the opening sentence, she describes him as a "longstanding" WHC employee "on MLOA," or medical leave of absence.

did Aka lose out for the Pharmacy Technician position, he was unable to secure any position at the several-thousand-employee hospital, and after a while could not even get an interview for positions for which he applied. There is in sum enough evidence, we believe, to create a jury question as to whether WHC's explanation for not hiring Aka was false, and as to whether WHC acted with discriminatory intent, and summary judgment should not have been granted.

## B. *Reasonable Accommodation*

We now turn to Aka's claim that WHC should have accommodated his disability by reassigning him to a vacant position.

The ADA prohibits discrimination on the basis of disability, and defines such discrimination to include

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A). Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question "would impose an undue hardship on the operation of the business" of the employer. The ADA also provides a definition of the term "reasonable accommodation":

> The term "reasonable accommodation" may include—
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or poli-

cies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added). Citing this provision, Aka argues that WHC's failure to reassign him to a vacant position violated the ADA.

Aka moved for summary judgment on his reasonable accommodation claim before the district court; the district court denied this motion, and instead granted summary judgment to WHC. The district court concluded that WHC could not have reassigned Aka without violating other employees' rights under the collective bargaining agreement governing Aka's workplace. The district court found that the ADA can never require an employer to violate such collectively bargained rights, and that therefore Aka had no right to reassignment.

### 1. *Was Aka "otherwise qualified"?*

■ Before addressing the question of the effect of the collective bargaining agreement on this case, we consider a preliminary question raised by WHC. We will assume for purposes of this appeal that Aka's inability to do heavy lifting after his heart surgery meant that he could not perform the orderly job, with or without a reasonable accommodation.[22] WHC argues that only a "qualified individual with a disability" can request a reasonable accommodation under 42 U.S.C. § 12112(b)(5)(A); the term "qualified individual with a disability" is defined as someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). WHC contends that, because Aka could not perform the essential functions of his job as an orderly with or without a reasonable accommodation, he was not an "otherwise qualified individual with a disability," and thus was not entitled to a reasonable accommodation at all under § 12112(b)(5)(A).

WHC's argument misreads the statute. Section 12111(8) defines an "otherwise quali-

---

**22.** Aka conceded that he could not do his former orderly job. WHC assumes that this meant that Aka could not do the job even with a reasonable accommodation, *see* WHC's Brief at 25–28, and Aka does not challenge WHC's assumption on this appeal.

fied individual with a disability" to mean someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires*." 42 U.S.C. § 12111(8) (emphasis added). An employee seeking reassignment to a vacant position is thus within the definition if, with or without reasonable accommodation, she can perform the essential functions of the employment position to which she seeks reassignment. *See Daugherty v. City of El Paso,* 56 F.3d 695, 698–99 (5th Cir.1995).

The Equal Employment Opportunity Commission's ("EEOC's") interpretive guidelines and the ADA's legislative history both support this reading. The EEOC's interpretive guidelines provide that "reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship." 29 C.F.R. App. § 1630.2(*o*). If WHC's reading of the ADA is correct, this guideline makes no sense. Under WHC's reading, an employee cannot obtain reassignment *if he is not* "otherwise qualified" for his current position. But under the EEOC's guidelines, *only* employees who cannot be accommodated in their current job without undue hardship—that is, only employees who are not "otherwise qualified" for their current position—should be reassigned. In other words, employees should only be reassigned if they have no entitlement to reassignment. This is a paradox worthy of Lewis Carroll, whose White Queen gave her maid "jam tomorrow and jam yesterday—but never jam *today*." LEWIS CARROLL, THE ANNOTATED ALICE 247 (New American Library 1960) (emphasis in original). Although the EEOC's guidelines are "not controlling upon the courts by reason of their authority," they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and we are understandably reluctant to adopt a reading of the ADA that is so at odds with those guidelines.

Notably, the ADA's legislative history supports the EEOC's reading. In discussing reassignment, the House Report says:

Reasonable accommodation may also include reassignment to a vacant position. If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker. Efforts should be made, however, to accommodate an employee in the position that he or she was hired to fill before reassignment is considered.

H.R.REP. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 345; *see also* S.REP. No. 116, 101st Cong., 1st Sess. at 6 (1989). In other words, Congress saw reassignment, as the EEOC does, as an option to be considered only after other efforts at accommodation ·have failed. *See also Gile v. United Airlines, Inc.,* 95 F.3d 492, 496–98 (7th Cir.1996) (reading the EEOC's guidance and the statute's legislative history similarly). The one decision of a court of appeals to adopt WHC's argument has since been set for rehearing in banc; in any event, we find the reasoning of the panel opinion unpersuasive. *See Smith v. Midland Brake, Inc.,* 138 F.3d 1304, 1308–10 (10th Cir.1998), *rehearing in banc granted,* 158 F.3d 1060, No. 96–3018, 1998 WL 686450, slip op. at 1 (10th Cir. May 5, 1998).

### 2. *The collective bargaining agreement*

The district court found that the collective bargaining agreement governing Aka's workplace precluded WHC from reassigning him to a vacant position, and hence Aka could not claim a right to the accommodation of reassignment. As we explain, on the present record we find it impossible to determine whether there is any conflict between the CBA and the ADA, and thus do not reach the question of what would occur on the particular facts of this case in the event of such a conflict.

 The district court found that the CBA's provisions governing posting and filling of job vacancies barred WHC from reassigning Aka. The CBA's posting provisions require WHC to give notice of any openings in designated locations for at least five work-

ing days before they may be filled. CBA § 14.19. As to filling of vacancies, the CBA provides:

> It is expressly understood that employees with the ability to perform the work and who possess an acceptable work record will be given preferential treatment over nonHospital employees in filling bargaining unit vacancies. If more than one employee bids for a particular job, and if in the Hospital's judgment competing employees have equal ability to perform the work and possess equally acceptable work records, the employee with greater seniority shall be awarded the job. It shall be the obligation of the employee first to make application for the position involved. In any case where there is a dispute as to whether an applicant possesses requisite "ability," the burden of proof shall be with the employee and/or the Union....

CBA § 8.1(b). Finally, the CBA has a provision entitled "Handicapped Employees," which states:

> An employee who becomes handicapped and thereby unable to perform his job shall be reassigned to another job he is able to perform whenever, in the sole discretion of the Hospital, such reassignment is feasible and will not interfere with patient care or the orderly operation of the Hospital.

CBA § 14.5.

Aka and the EEOC argue that section 14.5 permitted WHC to reassign Aka to a vacant position without complying with the CBA's provisions on seniority and posting vacancies. WHC disagrees, arguing vigorously that section 14.5 is not intended to function as an exception to those provisions, and that an employee can only be reassigned under section 14.5 after the CBA's posting and seniority rules have been complied with.[23]

WHC's reading of section 14.5 is at odds with that provision's plain meaning. To assign, according to *Webster's Third New International Dictionary*, means "to appoint (one) to a post or duty." An employee who is allowed to compete for jobs precisely like any other applicant has not been "reassigned"; he may have changed jobs, but he has done so entirely under his own power, rather than having been appointed to a new position. Moreover, WHC's reading would render section 14.5 meaningless. As WHC interprets that section, it would give neither WHC nor its employees any rights or powers that they do not already enjoy under other sections of the collective-bargaining agreement.[24] We assume that the parties intended for every part of the agreement to have meaning; interpretations that would render a portion of the agreement ineffective or mere surplusage are traditionally disfavored by courts. *See* FARNSWORTH ON CONTRACTS § 7.11 (1990); *see also Conoco, Inc. v. NLRB,* 91 F.3d 1523, 1526 (D.C.Cir.1996).

■ Finally, collective bargaining agreements are interpreted wherever possible so as to be consistent with federal labor law.

---

**23.** Arguably, the only tension that exists is between section 14.5 and the CBA's seniority rules, not its posting rules. If it chose, WHC could (for example) comply with the posting requirement by posting notice of several vacancies, and then, once applications were in, reassign a disabled employee to the vacant position that WHC considered most appropriate, in light of the applicant pool and the disabled employee's capabilities.

**24.** WHC argues that its reading does not completely eviscerate section 14.5, because that section allows it to grant extended jobsearch leaves of the kind awarded to Aka. Not only is there no textual basis for this reading of section 14.5, but WHC already has authority to extend leave under the CBA. Section 7.4, which sets time limits on

leaves of absence, permits WHC to waive those limits upon a written request.

WHC also claims that this situation is governed, not by section 14.5 of the CBA, but by section 7.3, which allows hospital employees returning from leaves of absence to retain their seniority and their preference over non-hospital employees. This misunderstands the functions of the two provisions. Section 7.3 governs employees returning from any type of extended leave of absence; such leaves may be granted for reasons ranging from "emergency conditions, unusual home situations, education, travel or other serious cause." CBA § 7.17. Section 14.5, by contrast, is directed solely at disabled employees. Indeed, Aka could have become disabled, and thus have been within section 14.5, without ever taking a leave of absence, and so coming within section 7.3.

*See International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Yard–Man, Inc.,* 716 F.2d 1476, 1480 (6th Cir.1983). Thus, an interpretation of section 14.5 which allows WHC to implement its ADA obligations is distinctly preferred. Indeed, Congress expressly suggested that, as a way of avoiding conflicts between the CBA and the ADA, collective bargaining agreements incorporate provisions "permitting the employer to take all actions necessary to comply with this legislation." H.R. REP. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 346.

It seems clear that WHC had power, under section 14.5 of the CBA, to reassign its disabled employees to vacant positions in at least some circumstances. On the present record, we cannot (and need not) reach the further question of whether in every case in which the ADA would require WHC to reassign an employee, section 14.5 would permit WHC to do so. The ADA's reassignment standard and that of section 14.5 are worded differently. The ADA requires covered entities to reasonably accommodate disabled employees unless they can demonstrate that such reassignment "would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). Section 14.5, by contrast, permits reassignment only if the hospital determines, in its "sole discretion," that "reassignment is feasible and will not interfere with patient care or the orderly operation of the Hospital." The language of section 14.5 seemingly grants quite broad reassignment powers to WHC. But it may be that those powers are not as broad as they seem. The union that negotiated the CBA has not participated in the proceedings before this court or before the district court, and extrinsic evidence—as to, for instance, section 14.5's negotiating history—might show that there are in fact limits to WHC's discretion to reassign employees under that section.[25] We will leave to the district court the determination of how broad WHC's reassignment powers under section 14.5 are, and whether reassigning Aka would have been permissible under that provision, properly interpreted.

### 3. *The dissents*[26]

The dissenters appear to argue that Aka's ADA claim can be rejected out of hand without reference to the CBA, because (1) the only discrimination he alleged was his failure to obtain the pharmacy position, and (2) his only right was to be treated like any other applicant for that position, which the dissent believes he indisputably was. Although under our normal procedures we would not consider either argument because they were not raised in the district court and were not within the scope of this court's grant of in banc review, in deference to our dissenting colleagues we will respond briefly.

We believe that Aka asserted below that he should have been reassigned to some existing vacancy for which he was qualified. This was how the district court interpreted his claim and how the panel originally construed it. Thus, Aka was not complaining only of his rejection for the pharmacy position; rather, his claim was that, because his disability rendered him unable to continue work at WHC unless he was reassigned to a new position, WHC's failure to reassign him in violation of its ADA obligations amounted either to constructively discharging him or to discriminating in filling those vacancies to

---

**25.** We assume that if the ADA requires WHC to reassign Aka, and WHC has the power to make the reassignment without violating the CBA rights of its other employees, WHC must make the reassignment, and may not refuse to do so on the grounds that it subjectively judges the CBA's standard not to be satisfied. This is so because if the rights of WHC's other employees under the CBA would not be violated by a reassignment, then the only CBA rights WHC has to invoke are its own. WHC would thus effectively be claiming that the CBA waives Aka's ADA rights. Although we need not decide now whether such waivers are permissible, we are skeptical. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII rights may not be waived in a CBA); *cf. Kralik v. Durbin,* 130 F.3d 76, 81 (3d Cir.1997) (observing that if a union declined to object to the accommodation of a disabled employee, this would eliminate any risk of conflict between the CBA and the ADA, without adverting to the employer's possible CBA rights).

**26.** Judge Sentelle does not join in Section B.3.

which he should have been reassigned, both violations of section 12112(a).[27]

Turning to the second part of the dissenters' argument, they claim that a disabled employee is never entitled to any more consideration for a vacant position than an ordinary applicant, because according to the disabled employee any kind of help would be a prohibited preference. We believe the dissents misunderstand both the text and legislative history of the statute, and deviate from the construction of the statute by other circuits. To begin with the statutory text, the word "reassign" must mean more than allowing an employee to apply for a job on the same basis as anyone else. An employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been "reassigned"; the core word "assign" implies some active effort on the part of the employer.[28] Indeed the ADA's reference to reassignment would be redundant if permission to apply were all it meant; the ADA already prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures." 42 U.S.C. § 12112(a); see *Ratzlaf v. United States*, 510 U.S. 135, 140, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (saying that "[j]udges should hesitate" to read statutory provisions as "surplusage").

Although the ADA's legislative history does warn against "preferences" for disabled *applicants*, see H.R.REP. No. 485(II), 101st Cong., 2d Sess., at 56 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 338, it also makes clear that reasonable accommodations for existing *employees* who become disabled on the job do not fall within that ban. *See* H.R.REP. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267,

345 ("If *an employee*, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker.") (emphasis added). Had Congress intended that disabled employees be treated exactly like other job applicants, there would have been no need for the report to go on to explain that " 'bumping' another employee out of a position to create a vacancy is not required," and that "if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to the job," *id.;* there would have been no danger that an employee would be "bumped," or that a job would go to a disabled employee with less seniority.

Numerous courts have assumed that the reassignment obligation means something more than treating a disabled employee like any other job applicant. *See, e.g., Gile*, 95 F.3d at 496–99 (describing what a plaintiff must show in order to demonstrate entitlement to reassignment, without mentioning a requirement that he show he would have been awarded the position over all other applicants); *Mengine*, 114 F.3d at 418 (same); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114–15 (8th Cir.1995) (same). Furthermore, the courts that have said that the ADA does not permit "preferences" in awarding jobs to the disabled have generally said so in the course of rebuffing requests which would have been especially disruptive to the employer's ordinary operations. *See,*

---

**27.** Under the applicable caselaw, it is true that Aka had an obligation to demonstrate that there existed some vacant position to which he could have been reassigned. *See, e.g., McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1165 (7th Cir.1997). On the other hand, WHC had a corresponding obligation to help him identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies). *See, e.g., Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 677 (7th Cir.1998) ("[T]he ADA places a duty on the employer to 'ascertain whether he has some job that the em-

ployee might be able to fill.' ") (quoting *Miller v. Illinois Dep't. of Corrections*, 107 F.3d 483, 487 (7th Cir.1997)); *Mengine v. Runyon*, 114 F.3d 415, 419–20 (3d Cir.1997). Thus far in the case, the parties have addressed neither the issue of whether appropriate vacancies existed nor that of whether WHC adequately discharged its duty to help Aka find them.

**28.** *See supra* § II.B.2 (similiarly interpreting the word "reassign" in a collective-bargaining agreement).

*e.g., Dalton,* 141 F.3d at 679 (concluding that requiring an employer to make a reassignment in violation of a legitimate, nondiscriminatory policy, such as a policy against demotions, would ·grant an improper preference, but without making a similar objection to the reassignment requirement itself); *Daugherty v. City of El Paso,* 56 F.3d 695, 699 (5th Cir.1995) (plaintiff sought to escape the requirement, applied to all employees, that he take a written exam in order to move from a parttime to a full-time job).[29]

 Recognized constraints on an employer's obligation to reassign a disabled employee further limit the disruption associated with reassignments. Most importantly, the ADA does not require that a disabled employee be reassigned to a position for which he is not otherwise qualified, *see* 42 U.S.C. § 12112(b)(5)(A), or if reassignment would be an undue hardship on the operation of the business of the employer, *see id.* An employee need not be reassigned if no vacant position exists, *see id.* § 12111(9); likewise, employers are not required to "bump" an employee, or to create a new position. *Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir. 1998). An employer is not required to reassign a disabled employee in circumstances "when such a transfer would violate a legitimate, nondiscriminatory policy of the employer," *Dalton,* 141 F.3d at 679 (also noting some limitations to this rule). Finally, "[a]n employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Gile,* 95 F.3d at 499.

Without briefing or any record on the issue we decline to decide the precise contours of an employer's reassignment obligations. To adopt the dissenters' interpretation of the reassignment provision as mandating nothing more than that the employer allow the disabled employee to submit his application along with all of the other candidates, however, would render that provision a nullity. That is all that we need say at this point.

## III. CONCLUSION

As to Aka's disparate treatment claim based on the Pharmacy Technician hiring decision, we conclude that he has made out a case sufficient to survive summary judgment under the appropriate reading of *McDonnell–Douglas* and *Hicks.* We accordingly vacate the district court's grant of summary judgment to WHC on this issue.[30] The question of whether WHC intentionally discriminated against Aka in the Pharmacy Technician hiring decision because of his age and/or his disability is one for a jury to decide.

As to Aka's reasonable accommodation claim, we reject WHC's claim that Aka's inability to perform his orderly job even with a reasonable accommodation rendered him ineligible for the reasonable accommodation of reassignment. We also find that the district court was incorrect in perceiving a conflict under all circumstances between the terms of the CBA and the ADA, and so need not have reached the issue of what would occur in the event of such a conflict. We thus reverse the district court's grant of summary judgment to WHC on this issue.

**29.** The ADA's reasonable accommodation requirement treats disabled and non-disabled employees differently in a number of other respects. Among the accommodations it lists are "job restructuring," "part-time or modified work schedules," "training materials or policies," and "the provision of qualified readers or interpreters." 42 U.S.C. § 12111(9)(B). Non-disabled employees may not request part-time or modified work schedules, or ask that they be provided with a reader, even though they may have excellent reasons to want these conveniences.

Treating a disabled employee who is no longer able to perform his existing job somewhat differently from other applicants for the same position need not always be highly disruptive to an employer's operations or seriously infringe

the interests of other employees. After all, seniority systems are not equated with undesirable preference schemes, even though they may have a much more profound effect on the workplace. (For instance, unlike the ADA, seniority systems often provide that less senior employees are laid off first, and allow for "bumping.") And moving a disabled employee to a new position necessarily creates a job vacancy, which may well be more desirable to third parties than was the position to which the employee was reassigned.

**30.** Those portions of the panel judgment, vacated on the grant of rehearing in banc, which affirm the trial judge's summary judgment rulings in favor of WHC as to Aka's remaining claims, are hereby reinstated.

On remand, the district court should determine, through summary judgment or trial, whether on the facts of this case WHC had an obligation under the ADA to reassign Aka to a vacant position. This entails deciding, among other questions, whether a vacant position for which Aka was qualified was available, and whether reassigning Aka would have been an undue hardship. If WHC was obliged to reassign Aka, the district court should then decide whether section 14.5 of the CBA permitted WHC to perform this reassignment. Only if the district court concludes that WHC did not have the power to reassign Aka under section 14.5 but that the ADA required WHC to reassign him will the ADA and the CBA be in conflict. Given the large number of contingencies that could preclude such a conflict, we see no need to address whether, if such a conflict arose, the CBA or the ADA would give way in the circumstances of this case.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, with whom SILBERMAN, WILLIAMS and GINSBURG, Circuit Judges, join, dissenting:

What remains of this case is neither complex nor difficult. Etim U. Aka contends that the district court incorrectly granted summary judgment on his claims against his former employer, Washington Hospital Center (Washington Hospital), under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, (ADEA) and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* Aka has alleged that Washington Hospital (1) failed to hire him as a pharmacy technician on account of his age and disability in violation of both the ADEA

and the ADA and (2) failed to reassign him to another position as a reasonable accommodation under the ADA when his disability prevented him from performing the duties of his former job as an orderly.[1] Aka's first claim fails because he produced no evidence in the district court to prove, as he must under a long line of decisions culminating in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), that Washington Hospital's nondiscriminatory reasons for rejecting his application were proffered as a pretext for its true motive which was discriminatory. Aka's second claim fails because he has not tied the alleged failure to accommodate to a specific actionable employment decision, as explained in our holding in *Marshall v. Federal Express Corp.*, 130 F.3d 1095 (D.C.Cir.1997).

### I.

First, the district court correctly granted summary judgment on Aka's discrimination claims under the ADEA and the ADA because Aka produced no evidence raising a triable issue of fact about either whether Washington Hospital's articulated reasons for rejecting Aka's application were false and or whether its real reason was discriminatory.

In both ADEA and ADA discrimination cases we apply the burden allocation scheme first announced in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Paquin v. Federal Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C.Cir.1997) (ADEA case); *Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1099 (D.C.Cir.1997) (ADA case).[2] As we have previously explained:

> manifests Aka's successful twenty-year employment relationship with Washington Hospital. To note the obvious, his race and national origin did not change during that time. To infer that Washington Hospital would begin discriminating on the basis of his race and national origin after twenty years of non-discrimination strains credulity.").

1. In his all-inclusive complaint, Aka also alleged other claims of discrimination. The panel affirmed (and rehearing was not granted) on Aka's ADA and ADEA claims based on his failure to secure file clerk positions with Washington Hospital and Aka himself eventually dropped his claims of violation of the District of Columbia Family and Medical Leave Act, *see Aka v. Washington Hospital*, 116 F.3d 876, 879 n. 2 (D.C.Cir. 1997), and discrimination on the basis of race and national origin, *see* Brief of Appellant Etim U. Aka on Rehearing *in Banc* at 5 n.2; *see also Aka v. Washington Hospital* 116 F.3d at 902 n. 6 (Henderson, J., dissenting in part) ("The record

2. In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Supreme Court "assumed," without actually deciding, that the *McDonnell–Douglas* framework applied in ADEA

Under the first step of *McDonnell–Douglas* the complainant must establish a prima facie case of discrimination.... If the complainant succeeds in establishing a prima facie case, the second step of the *McDonnell–Douglas* framework shifts the burden to the defendant employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If the defendant does so, then under the third step of *McDonnell–Douglas* the complainant must produce evidence showing that the defendant's proffered reason is but a pretext for discrimination.

*Paquin,* 119 F.3d at 26–27 (internal citations omitted). Key to the third step of the analysis is the phrase "pretext for discrimination," which has sometimes been construed (incorrectly) to mean simply a false reason.

The word "pretext" is defined as "[t]hat which is put forward to cover the real purpose or object." *See* XII *Oxford English Dictionary* 437 (2d ed.1989). Thus, a pretext is not merely a false reason but a false reason proffered *to cover up* the true reason. *See Fisher v. Vassar College,* 114 F.3d 1332, 1337–38 (2d Cir.1997) (*en banc*) ("[D]iscrimination does not lurk behind every inaccurate statement.... In short, the fact that the proffered reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff."), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Recognizing this, the *Hicks* majority repeatedly explained that a plaintiff must do more than simply cast doubt on the truth of the employer's proffered legitimate reason; he must also affirmatively show it was proffered *as a cover-up for a discriminatory reason.*[3] *See* 509 U.S. at 507–08, 113 S.Ct. 2742 (" 'If the defendant carries this burden of production, the presumption raised by the prima facie case is

rebutted' and 'drops from the case.' The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' *and that race was.* He retains that 'ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination.' ") (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 255 n. 10, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (emphasis added); *id.* at 514–15, 113 S.Ct. 2742 ("[N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable."); 509 U.S. at 515, 113 S.Ct. 2742 ("A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."). This is how four other circuits—and even the *Hicks* dissent—have interpreted the plain language in the *Hicks* majority opinion. *See Vaughan v. Metrahealth Cos.,* 145 F.3d 197 (4th Cir.1998); *Ryther v. KARE 11,* 108 F.3d 832, 836–37 (8th Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997); *Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 335–37 (1st Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1337–38 (2d Cir.1997) (*en banc*); *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (*en banc*); 509 U.S. at 535, 113 S.Ct. 2742 (Souter, J., dissenting). I would do likewise.

It is true that the majority opinion in *Hicks* also included the following language, routinely cited by courts that require a plaintiff to show only that the proffered reason is false:[4]

cases. The Court has yet to address whether the framework applies to ADA cases.

**3.** There are many explanations for an employer's reluctance to disclose a true, *non*discriminatory reason for an adverse employment decision. For example, the real motive might be embarrassing, albeit lawful, or the employer might simply wish to spare the feelings of an employee he considered unsatisfactory in performance, personality or some other regard.

**4.** *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1529 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 343–44 (6th Cir.1997) (*en banc*); *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1066–67 (3d Cir.1996) (*en banc*), *cert. denied,* —— U.S.

The factfinder's disbelief of the reasons put forward by the defendant (particu-larly if disbelief is accompanied by a suspicion of mendacity) *may,* together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required.*"

509 U.S. at 511, 113 S.Ct. 2742 (first emphasis added; footnote omitted) (quoting *Hicks v. St. Mary's Honor Center,* 970 F.2d 487, 493 (8th Cir.1992)). The quoted passage does not mean, as some courts have construed it, that disbelief coupled with proof of a prima facie case is *always* sufficient either to survive summary judgment or to support a jury verdict. "The word 'may' is ambiguous. It might mean that the factfinder is completely free to find discrimination, in the sense that an appellate court could never reverse such a decision on the evidence. Alternatively, it might mean that in some cases the combination will be adequate to sustain a finding of discrimination, in others not, to be determined by the factfinder initially, and the appellate court on review, according to the usual principles." *Barbour v. Merrill,* 48 F.3d 1270, 1281 (D.C.Cir.1995) (Williams, J., concurring in denial of rehearing). Given the *Hicks* majority's repeated emphasis on the need to prove that an employer's proffered reason for an employment action is a *pretext for discrimination,* I can only conclude, as did Judge Williams, that the Court intended "may" to bear the second meaning. As the Fourth Circuit explained:

Undoubtedly, the quoted passage suggests that some plaintiffs may reach the jury solely on the basis of "[t]he factfinder's disbelief of the reasons put forward by the defendant ... together with the elements of the prima facie case." This is unremarkable, as a prima facie case of age discrimination often requires "some other evidence that the employer did not treat age neutrally," such as discriminatory comments or marked favoritism towards younger, less qualified workers. Depending on the character of the evidence in each case, a discrimination claim may survive summary judgment solely on the strength of the prima facie case and the evidence that contradicts the employer's proffered justification—if that evidence provides a factual basis for the ultimate finding of discrimination.

*Vaughan v. Metrahealth Cos.,* 145 F.3d at 201 (quoting *Equal Employment Opportunity Comm'n v. Western Electric Co.,* 713 F.2d 1011, 1015 (4th Cir.1983)); *see also Isenbergh v. Knight–Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 441 (11th Cir.1996) (per curiam) ("The first sentence of [the quoted *Hicks*] passage shows that disbelief of the employer's proffered reason may (and by implication, may not) be enough for a plaintiff to overcome an employer's motion for judgment as a matter of law. The second sentence is potentially more confusing in saying that rejection of the proffered reason 'will permit' the inference of discrimination. But keeping in mind that the word 'will' sometimes means 'can' (for example, 'can permit') or 'capable of,' (for example, 'capable of permitting'), both sentences, when read together, at least strongly suggest that rejecting the employer's proffered reason is not always sufficient to allow a finding of discrimination, although sometimes '(particularly if disbelief is accompanied by a suspicion of mendacity)' it might be."), *cert. denied,* —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997); *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (*en banc*) ("The evidence necessary to support an inference of discrimination will vary from case to case. A jury may be able to infer discriminatory intent in an appropriate case from substantial evidence that the employer's proffered reasons are false. The evidence may, for example, strongly indicate that the employer has introduced fabricated justifications for an employee's discharge, and not otherwise suggest a credible nondis-

——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1123–24 (7th Cir.1994); *Washington v.*

*Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) (as amended).

criminatory explanation."); *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 348 (1st Cir.1998) ("Thus, under the ADEA, if the plaintiff establishes that the defendant's proffered reasons for the adverse employment action are not the true reasons, the trier of fact may, depending on the overall evidence, *but is not required*, to infer that intentional age-based discrimination was a determinative factor in the adverse employment action.") (emphasis added).

In a welcome concession to common sense, the majority seems to agree that the plaintiff, to survive summary judgment, must do *something* more than simply show that the proffered reason could be false. *See, e.g.,* Maj. Op. at 1289–90. The problem is that in its very next breath the majority rejects "any reading of *Hicks* under which employment discrimination plaintiffs would be routinely required to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Id.* In other words, once the defendant has offered a nondiscriminatory rationale and the plaintiff has raised a jury question as to its veracity, the majority would place some sort of additional burden on the defendant—to show, perhaps that the plaintiff's own evidence points to a permissible (although perhaps embarrassing) "third" motive, *see* Maj. Op. at 1290 or that the defendant has a sterling record on equal employment opportunity matters in general, *see id.* at 1291. If the defendant does not carry this burden, then the jury will be allowed to infer the ultimate fact of discrimination from the existence of *some* rebuttal evidence—evidence which, by its very he-said-she-said nature, tends to be easy to come by. To make matters worse, the majority refuses "to say in any concise or generic way when such an inference will be appropriate." *Id.* at 1293–94. The result is a framework (if one can call it that) that is both devoid of intelligible standards and incompatible with the principle that the plaintiff bears the burden of proof on the ultimate fact. *See Hicks,* 509 U.S. at 511, 113 S.Ct. 2742 ("[T]he Court of Appeals' holding that rejection of the defen-

dant's proffered reasons compels judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.' ").

In light of the plain meaning of *Hicks,* I conclude that an employment discrimination plaintiff must offer evidence not only that the employer proffered an untrue reason for the challenged employment action but also— whether as part of the prima facie case or independently—that the employer did so in order to cover up the true reason—which reason was discriminatory. Aka has failed to point to any such showing in the record, which contains no evidence raising a triable issue of fact as to whether Washington Hospital's proffered reasons for rejecting his application for the pharmacy technician opening were false, much less whether they were pretexts for discrimination.

In the district court Washington Hospital offered two nondiscriminatory reasons for hiring Jaime Valenzuela over Aka: (1) Valenzuela had more relevant experience for the pharmacy technician position and (2) Valenzuela displayed more enthusiasm during his interview than Aka did in his. Aka has failed to identify evidence discrediting either reason.

To counter Washington Hospital's assertion that Valenzuela was more qualified, Aka argues that both his education (Bachelor's and Master's degrees in Public Health Service Management) and his experience (twenty years as an orderly at Washington Hospital) made him more qualified that Valenzuela who had "extremely little relevant experience, and no relevant education." Appellant's Brief at 27. That Aka had more education and more hospital experience is undisputed. But neither was particularly "relevant."

The published "qualifications" for a pharmacy technician list no educational requirement—not even a high school diploma.[5] Nor is there any evidence that its duties re-

---

5. The qualifications for the position of orderly— which Aka formerly occupied—required a

"[h]igh school diploma or equivalent." JA 324.

quire—or would benefit from—either a Bachelor's or a Master's degree. Ann Breakenridge, who interviewed both applicants for the pharmacy technician opening, recognized that Aka's education degrees would be wasted in the pharmacy technician job, noting in her "interview summary report" that "Mr. Aka's MBPA degree could be best utilized in other areas of the Hospital." JA 230. Put simply, Aka's academic credentials did nothing to enhance his qualifications for the position for which he applied.[6]

Nor did Aka's experience—at least insofar as it was known to Dr. Breakenridge at the time she chose Valenzuela over him—make him a better candidate for the technician opening. Aka asserted in an affidavit below (and we must accept as true here) that as an orderly he "was regularly assigned to pick up medications from Pharmacy, stock medications in the nurses work area, and even sometimes prepare orders for medications that were not in sufficient stock in the nurses work area," that he "had extensive knowledge and background with the forms used by the pharmacy for filling medications" and that he "knew how most of the medications were used by nurses in their care of patients." JA 391. Yet there is no record evidence that Aka ever brought this "relevant experience" to the attention of Breakenridge or that Breakenridge was aware of it[7]—as she was of Valenzuela's two months of actual pharmacy employment and his experience in "pricing, stocking, [and] filling up cassettes," noted on his application. JA 226.

Aka also disputes Breakenridge's assessment that he was a less enthusiastic applicant than Valenzuela, maintaining that he too displayed enthusiasm for the position during his interview. But Breakenridge's judgment about the two applicants' enthusiasm was an inherently comparative one. See JA 222–23. Assuming that Aka was enthusiastic, he offers no evidence to show that Valenzuela was not more so (or at least that Valenzuela did not appear that way during his interview). More to the point, Aka cited no evidence that Washington Hospital offered either lawful justification as a pretext to conceal an unlawful motive. If Aka's claim, devoid as it is of any discriminatory showing, can survive summary judgment, I cannot envision a claim that would not.

## II.

I would also affirm the district court's summary judgment on Aka's ADA reasonable accommodation claim. Aka alleges, as far as I can tell, that Washington Hospital breached its duty under the ADA to transfer Aka, as a reasonable accommodation, to a job that he could perform notwithstanding his disability. I do not question that under certain circumstances an employer has a duty to reasonably accommodate an employee's disability by reassigning him to an open position for which he is qualified. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."); 42 U.S.C. § 12112(b)(5)(A) ("[T]he term 'discriminate' includes—. . . (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hard-

---

6. In fact, in contrast to the majority's observation, see Maj. Op. at 1297 n.15, some courts have concluded that claimed reliance on criteria not mentioned in a job description supports an inference of discrimination. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 421 (7th Cir.1994); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1225 (2d Cir.1994); *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1109 (8th Cir.1994), cert. denied, 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994).

7. In her interview summary report Breakenridge noted only that Aka's orderly position had a "drug delivery aspect," JA 229, which is consistent with both the published description of the orderly position (orderly "[c]ollects and/or delivers a variety or items to and from the unit," including "Medical Materials," JA 323) and Aka's own deposition testimony (that his "experience in pharmacy services consists of transporting narcotics and drugs to and from the pharmacy" and that he had "[n]o other experience," JA 129).

ship on the operation of the business of such covered entity."); 42 U.S.C. § 12111(9)(B) ("The term 'reasonable accommodation' may include—... reassignment to a vacant position.... "). But the only adverse decision Aka has cited—the failure to reassign him to the pharmacy technician position—was not a refusal to reasonably accommodate Aka's disability. Washington Hospital accommodated Aka's disability by affording him the opportunity to apply for reassignment to the vacant position. It accepted his application and interviewed him for the opening. There is no reason to doubt that Washington Hospital also would have hired Aka had he proved the more qualified candidate for the job. As explained earlier, he did not. Washington Hospital was under no duty to afford Aka a hiring preference—because of his disability—over a more qualified, nondisabled applicant. The Congress made clear when the ADA was enacted that employers were not expected or required to extend such preferences. *See* H.R.Rep. No. 101–485, pt. 2, at 56, 1990 U.S.C.C.A.N. at p. 338 (1990) ("[T]he employer would be permitted to reject the applicant with a disability and choose the other applicant for reasons not related to the disability or to the accommodation or otherwise not prohibited by this legislation. In other words, the employer's obligation is to consider applicants and make decisions without regard to an individual's disability, or the individual's need for a reasonable accommodation. But, the employer has no obligation under this legislation to prefer applicants with disabilities over other applicants on the basis of disability."); *see also Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 384 (2d Cir.1996) ("Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons."); *Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995) ("[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that

disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less."), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996); *cf. Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222, 1225 (11th Cir.1997) (no duty to transfer "where the employer (independent of concerns about disability) has a business policy against the pertinent kind of transfer."); *Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 679 (7th Cir.1998) ("[W]e have been unable to find a single ADA or Rehabilitation Act case in which an employer has been required to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer."). Accordingly, Washington Hospital's refusal to hire Aka over the more qualified Valenzuela is not actionable.[8]

Finally, the majority would remand for the district court to determine the contours of Washington Hospital's right under the collective bargaining agreement to reassign Aka as a reasonable accommodation and of Aka's right to such an accommodation under the ADA. Maj. Op. at 1302–03. I have no idea how the majority expects the district court to fulfill its mandate. Having claimed no adverse personnel action other than denial of the pharmacy job, and specifically having made no claim of wrongful termination, Aka is not in a position to argue that failure to accommodate him in some other position breached any duty under the ADA. *See Marshall v. Federal Express Corp.,* 130 F.3d 1095–98 (D.C.Cir.1997) ("[F]or discrimination (including denial of reasonable accommodation to be actionable, it must occur *in regard to* some adverse personnel decision or other term or condition of employment.") (emphasis original)). And the majority has failed to fill in the gap. Further, given that the Congress did not intend to establish a preference regime under the ADA, I cannot accept the majority's suggestion that reasonable accom-

---

8. I find it unnecessary to consider how the collective bargaining agreement might affect Washington Hospital's reasonable accommodation duty under the ADA both because Aka has not shown Washington Hospital was under any such duty and because the majority opinion expressly declines to resolve "whether reassigning Aka would have been permissible under [the collective bargaining agreement]", Maj. Op. at 1303.

modation requires that a disabled person be transferred to any open position for which he is qualified (such as the pharmacy technician position here), regardless of other applicants' qualifications, so long as the reassignment does not impose "undue hardship" on the employer. *See* Maj. Op. at 1302–03.[9]

For the preceding reasons I would affirm the district court's summary judgment *in toto.* I therefore dissent.

SILBERMAN, Circuit Judge, with whom WILLIAMS and GINSBURG, Circuit Judges, join, dissenting:

I join Judge Henderson's opinion, but wish to make a few brief additional comments. With respect to the first issue in the case, there really is a rather stark difference between the majority's approach and that of the Second Circuit in *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). To be sure, both the majority and the Second Circuit *en banc* opinion purport to take a middle ground. *Compare* Maj. Op. at 1291–92 (emphasis added) ("[I]n *some instances* ... the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination."); *with Fisher,* 114 F.3d at 1333 (emphasis added) ("[E]vidence constituting a prima facie case prior to the employer's proffer of a reason, coupled with the error or falsity of the employer's proffered reason *may—or may not—*be sufficient to show illegal discrimination by a preponderance of the evidence.").

But a middle ground—where a plaintiff "in some instances" does, and "in some instances" does not, survive summary judgment merely by undermining the employer's proffered reason—is an illusion. The truth is that the majority's holding ineluctably devolves into the "pretext-only" approach earlier embraced by the panel and by several of our sister circuits, *see, e.g., Aka v. Wash. Hosp. Ctr.,* 116 F.3d 876, 881 (D.C.Cir.1997);

*Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1066–72 (3d Cir.1996) (en banc); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1123–24 (7th Cir.1994). That becomes apparent when one scrutinizes the scenarios offered by the majority to reassure us that a plaintiff who discredits an employer's proffered reason will not *always* survive summary judgment.

The majority's first scenario is "a case in which the plaintiff calls the employer's explanation into question, but does so in a way that conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation"—what might be called the plaintiff-shooting-himself-in-the-foot scenario. Maj. Op. at 1291. As an example, the majority points us to a situation where the plaintiff had claimed that he had been fired because of his age. When his employer proffered a number of nondiscriminatory explanations, including the plaintiff's insubordination, the plaintiff responded with evidence that in fact the real reason he had been discharged was that he had discovered that his employer was violating Securities and Exchange Commission rules and the employer wished to cover this problem up; in so responding, the plaintiff undermined his own claim of age discrimination. *See* Maj. Op. at 1291–92 (citing *Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328 (8th Cir.1996)). The majority thus assures us, rebutting an employer's proffered reason is not invariably enough: this "class" of plaintiffs will continue to be weeded out at the summary judgment stage. But it should be obvious that this hypothetical—although it once arose—is a sport; a plaintiff's lawyer cannot be expected to put on such self-destructive evidence.

The majority's second scenario is "a case in which a plaintiff has created only a weak issue of ... fact as to whether the employer's explanation is untrue, and there is abundant independent evidence in the record that no discrimination has occurred." Maj. Op. at 1291–92. The majority explains that "inde-

---

**9.** The majority, while eschewing express endorsement of preferences, nonetheless appears to adopt the position, urged by Amicus Curiae Equal Employment Opportunity Commission in

its brief, *see* Brief of Amicus Curiae at 22–23, that such a preference is what the ADA envisions. Otherwise, the majority's discussion of reasonable accommodation is irrelevant.

pendent evidence ... that no discrimination has occurred" might include whether the hiring officer belonged to the same protected class as the plaintiff or whether the employer has a strong record of equal opportunity employment. *See id.* This hypothetical betrays the majority's misunderstanding of the requisite burden of proof in a Title VII case. The majority implicitly requires the *employer* to produce, in support of its summary judgment motion, "abundant independent evidence ... that no discrimination has occurred."[1] That approach is inconsistent with the *McDonnell–Douglas* framework because it places the burden of persuasion on the defendant. As the Supreme Court made clear in *Hicks,* once the employer produces a legitimate nondiscriminatory reason for the challenged decision, the presumption that the employer discriminated "drops out of the picture" and the *plaintiff* "at all times bears the burden of persuasion." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citations and internal quotation marks omitted). I agree that "independent evidence" is crucial at the summary judgment stage. But it is independent evidence of *discrimination* put forth by the *plaintiff,* not—as the majority suggests—independent evidence of *non-discrimination* put forth by the *defendant.*

In practical application, then, the majority's position promises that plaintiffs will "routinely," Maj. Op. at 1290, be able to get to juries based on a collateral issue without ever really showing evidence of discrimination—what amounts, *de facto,* to a broad "wrongful discharge" cause of action for a plaintiff in a protected class.

As noted, the Second Circuit, like the majority, appeared to claim that it too was adopting a middle ground by saying that "the falsity of the employer's proffered reason may—or may not—be sufficient to show illegal discrimination by a preponderance of the evidence," 114 F.3d at 1333, and later that

"[t]he sufficiency of a finding of pretext to support a finding of discrimination depends on the circumstances of the case," *id.* at 1338. At the end of the day, however, when one looks at the holding rather than general language, the Second Circuit diverges from the majority in this case. The *en banc* court left intact the Second Circuit panel's holding that the district court committed clear error in concluding—based solely on a finding that the university's proffered nondiscriminatory reasons were pretextual—that the real reason for the challenged tenure decision was discrimination. *See id.* at 1347. By contrast, the majority here holds that appellant Aka should have survived summary judgment merely because he created a jury question as to whether the employer's explanation for not hiring him was false. *See* Maj. Op. at 1299–1300. Thus, in the Second Circuit, a plaintiff will lose on summary judgment unless he presents independent evidence of discrimination, while in our circuit, a plaintiff will survive summary judgment merely by putting in issue the employer's proffered nondiscriminatory explanation.

I think the Second Circuit's actual holding, which accords with the position adopted by the First and Fourth Circuits, *see Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 337 (1st Cir.1997); *Vaughan v. MetraHealth Cos., Inc.,* 145 F.3d 197 (4th Cir.1998), is faithful to the notion that the *McDonnell–Douglas prima facie* case is only a burden of production shifting device and really has minimal probative value. If an employer meets its burden of producing a nondiscriminatory explanation, then it will not do for the plaintiff simply to rebut that explanation. To survive summary judgment, the plaintiff must *always* produce independent evidence of discrimination. Only if we require such a showing do we preserve the plaintiff's congressionally-mandated burden to show that the employer's real reason for its personnel decision was discrimination on

---

1. To be sure, a FED. R. CIV P. 56(c) movant does bear the burden of demonstrating that there is "no genuine issue as to any material fact." *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rodway v. United States Dep't of Agriculture,* 482 F.2d 722, 727 (D.C.Cir.1973). Here, the employer met that burden by pointing out that the plaintiff admitted in his deposition that he had no evidence for asserting that his alleged disability was a factor in the decision not to hire him. *See* Washington Hospital Center's Statement Of Material Facts As To Which There Is No Genuine Issue, ¶ 29 at 10 [J.A. 22] (citing Plaintiff Tr. 105–106).

the basis of the plaintiff's membership in a protected class.

\* \* \* \* \* \*

Turning to the reasonable accommodation claim, a preliminary point is in order. The majority asserts that this issue is not properly before us. *See* Maj. Op. at 1303–04 ("Although under our normal procedures we would not consider [the issue] because [it] was not raised in the district court and [was] not within the scope of this court's grant of in banc review, in deference to our dissenting colleagues we will respond briefly."). If the *majority* were to follow our "normal procedures," however, plaintiff's claim would not be before the court at all. As Aka's counsel conceded at oral argument, Aka never (*i.e.*, neither before the district court, the panel, nor the court *en banc*) connected his reasonable accommodation claim to any personnel decision or job opportunity, as he is required to do under *Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1099 (D.C.Cir.1997). Even though *Marshall* would not be controlling in an *en banc*, the majority does not overrule it or even cite it. Thus, it is the majority that has done Aka's pleading work for him at this late hour by tying Aka's reasonable accommodation claim to the specific pharmacy technician position. I also find puzzling the majority's assertion that the reasonable accommodation issue was not within the scope of our grant of *en banc* review. Question two of our order granting *en banc* review asked:

> Does a collective-bargaining agreement that permits a disabled employee to be reassigned to a vacant position if, in the "sole discretion" of the employer, the reassignment is "feasible" and "will not interfere with patient care or the orderly operation" of the workplace incorporate a different standard than that of the Americans with Disabilities Act, which requires that a disabled employee be reassigned to a vacant position if doing so would not impose an "undue hardship"?

Order, No. 96–7089 (Jan. 30, 1998). Before one is able to compare the standard of the ADA with that of the collective-bargaining agreement, one must first ascertain the standard of the ADA itself. Thus, analysis of the scope of an employer's obligation to make reasonable accommodations by "reassign[ing a disabled employee] to a vacant position," 42 U.S.C. § 12111(9)(B) (1994), is clearly within the scope of our order granting *en banc* review.

Although the majority's discussion of Aka's reasonable accommodation claim obscures its relationship to his basic claim, it should be obvious that if Aka's disparate treatment claim survives the employer's summary judgment motion and the jury returns a verdict for Aka on this claim, then his reasonable accommodation claim is redundant. Only if Aka loses on his disparate treatment claim could the reasonable accommodation claim become meaningful. But that necessarily means that the reasonable accommodation claim—recall that the contended-for reasonable accommodation is reassignment to a vacant position—requires more of the employer than the disparate treatment claim, which merely relies on an antidiscrimination rule. That is, on Aka's (and the majority's) view, the reasonable accommodation claim mandates that the employer grant a preference to disabled employees over nondisabled employees in filling vacant positions.

I think the majority's reading of the ADA is simply wrong. The majority overemphasizes the dictionary definition of the word "reassign" and declines to read "reassignment to a vacant position" in the context of the other types of reasonable accommodation listed in 42 U.S.C. § 12111(9). Those examples share the common theme of regulating the relationship of the disabled employee vis-à-vis the employer, making no mention of the disabled employee's rights vis-à-vis other non-disabled employees or applicants—that is, none even alludes to the possibility of a preference for the disabled over the non-disabled. The first type of reasonable accommodation, "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," imposes an obligation on the employer but has no immediate impact on non-disabled employees. Likewise, "job restructuring" and "part-time or modified work schedules" involve accommodations made to the disabled employee in

his current position and thus have no direct effect on non-disabled employees or applicants. And the "acquisition of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities," 42 U.S.C. § 12111(9)(B), may impose costs on the employer, but work no harm on nondisabled employees. In short, all of these sorts of reasonable accommodation deal with the relationship between the disabled employee and the employer, and have no direct impact on the situation of non-disabled employees or applicants.

If the Congress had intended to grant a preference to the disabled—a rather controversial notion—it would certainly not have done so by slipping the phrase "reassignment to a vacant position" in the middle of this list of reasonable accommodations. Indeed, the catch-all "and other *similar* accommodations for individuals with disabilities," 42 U.S.C. § 12111(9)(B) (emphasis added), strongly indicates that the Congress perceived each of the enumerated types of reasonable accommodation to be of the same character. If "reassignment to a vacant position" is read in context, therefore, it must mean that an employer is obligated—if another type of reasonable accommodation cannot be made in the disabled employee's current position—to allow a disabled employee to compete (on equal terms with non-disabled employees) for vacant positions. On this understanding of "reassignment to a vacant position," the phrase fits in with the common theme of regulating the relationship between disabled employee and employer without directly affecting non-disabled employees. This reading accords with the House Report's recognition that "the employer's obligation is to consider applicants and individuals without regard to an individual's disability, or the individual's need for a reasonable accommodation. *But, the employer has no obligation under this legislation to prefer applicants with disabilities over other applicants on the basis of disability.*" H.R. REP. No. 485(II), 101st Cong., 2d Sess., at 56 (1990) (emphasis added).

Contrary to the majority's assertion, this interpretation of the statute does not render the "reassignment to a vacant position" phrase a "nullity." Maj. Op. at 1305. I read that provision as designed to prevent an employer from as a matter of policy—either blanket or *ad hoc*—forbidding employees, including disabled ones, from applying for other positions. *See* H.R. REP. No. 485(II), 101st Cong., 2d Sess., at 58 ("[I]t would be a violation for an employer to adopt ... a presumption that no individual with a disability would be interested in moving into a particular job.").