STEPHEN F. WILLIAMS, Senior Circuit Judge,
dissenting.
The majority concludes that a reasonable jury could find in appellant’s favor with regard to one of his claims. Maj. Op. at 505-06. Like the majority, I view the evidence as a “close call,” Maj. Op. at 509, but I believe no reasonable jury could make the required finding.
In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court stated that
an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer’s decision, or if the plaintiff created only a weak issue of fact as to whether the employer’s reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.
Id. at 148, 120 S.Ct. 2097; see also Aka v. Washington Hospital Center, 156 F.3d 1284, 1291-92 (D.C.Cir.1998) (en banc). This is just a linguistic variant of the standard rule that the party with the burden of persuasion cannot defeat summary judgment by offering only a “scintilla” of proof. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Taylor v. Small, 350 F.3d 1286, 1295 (D.C.Cir.2003). In my view, Salazar’s evidence, viewed in the light most favorable to him, yields just such a “weak issue of fact,” no more than a scintilla.
Salazar came in fourth in a six-person competition for promotion to the position of Craft Supervisor in General Equipment at WMATA’s Metro Center station. If I understand the majority, it believes that three features of the selection process could in the aggregate enable a reasonable jury to find that WMATA had discriminated: first, the fact that Timothy Tucker, number one in the competition, ended up *513 not taking the Metro Center position, but instead took what Salazar said was a “less difficult” one in Greenbelt; second, the role of two WMATA higher-ups, Gary Lewis and Buddy Jaggie, in the competitive process; third, and related to the second, the nature of the questions posed in the competition and the weighting of questions.
The majority regards the fact that the selected applicant (Tucker) apparently never held the Metro Center job as increasing “the possibility that the interview process ... may not have been fairly designed.” Maj. Op. at 509. There is in fact an evidentiary vacuum as to what happened after the competition (other than Tucker’s going to Greenbelt). Technically, this is a gap in the plaintiffs prima facie case, in which the fourth element is evidence that “the position remained open [after the plaintiff lost out] and the employer continued to seek applicants from persons of [the plaintiffs] qualifications.” McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139 (D.C.Cir.2004), we held that plaintiffs failure to show the sequel to her rejection was fatal to her prima facie case. Id. at 1151-53. WMATA here waived any argument as to inadequacies in the prima facie case, but it is still ironic that Salazar has managed to transform a similar gap into a special point in his favor. The transformation is especially odd because the innocent reasons why a winning competitor might take another job are legion — personal convenience, a better fit with his skills, a better match with fellow workers, etc. Even winners change their minds.
The majority thinks that a reasonable jury “could infer something ‘fishy’ ” from Lewis’s appointment of Jaggie, his assistant, as panel chair. See Maj. Op. at 509. The majority sees this as problematic first as a breach of Thomas’s promise that the search process would be Lewis-free, and second as leading to interview characteristics that the majority believes might reasonably be thought discriminatory. I am unable to identify a scintilla of evidence that Jaggie’s participation disadvantaged Salazar.
To give weight to the broken promise, the majority cites a line of cases holding that departures from normal hiring processes may justify inferences of discrimination. See Maj. Op. at 509 (citing Lathram v. Snow, 336 F.3d 1085, 1093-94 (D.C.Cir.2003); Johnson v. Lehman, 679 F.2d 918, 922 (D.C.Cir.1982)). But an employer’s departure from standard procedures does not automatically support such an inference; the plaintiff must still establish discriminatory motive. Johnson, 679 F.2d at 922. Here, in fact, WMATA’s effort to devise a Lewis-free hiring process was itself a departure from existing practice; a departure from the departure merely returned things to the status quo. See Maj. Op. at 509. So it is far from obvious that the cases involving departure from existing practice apply. Even assuming they do, such cases always challenge a departure that actually disadvantaged the applicant in some way. See, e.g., Lathram, 336 F.3d at 1093 (decision to expand search outside agency thereby allowing second candidate to receive a veteran’s preference and thus to outscore internal candidate); Pratt v. City of Houston, 247 F.3d 601, 605 (5th Cir.2001) (allegation that interviewer sprung a computer skills test on applicant, having given no notice that such a test would be part of the process). Here there is simply no evidence that the alleged departure from practice hurt Salazar’s chances, much less an affirmative showing that the “departure” was discriminatory. See Risher v. Aldridge, 889 F.2d 592, 597 (5th Cir.1989).
*514 As the majority points out, the record evidence clearly shows that “the scores Jaggie gave Salazar differed little from those given by two other panelists whom Salazar himself acknowledges would be unlikely to discriminate,” Maj. Op. at 509, that “Salazar would have finished fourth even had Jaggie’s scores not counted,” id,., and that “no evidence suggests that Jaggie attempted to influence the other panelists’ scores during the interview,” id. Because Jaggie’s involvement had no measurable impact on the hiring outcome, the majority seeks to shore up the case for a plausible inference by emphasizing that Jaggie developed the interview questions and assigned the relative value for each, giving “only marginal value to candidates’ experience and education, which were Salazar’s particular strengths.” Maj. Op. at 509.
But Salazar nowhere asserts that any of the questions themselves was unfair or inappropriate, or that the distribution was in any way unusual. Indeed, they would seem to cover precisely the range of scenarios relevant to the selection of a qualified supervisor. Compare Maj. Op. at 509 (“Jaggie not only developed the questions but assigned the relative value for each, and had apparently unfettered discretion in doing so.”) (emphasis added) (internal quotation marks and citations omitted). And lest there be any confusion about the matter, it was not an odd or idiosyncratic weighting scheme that cost Salazar the post. The majority notes that out of 13 questions, 11 (with a weight of nearly 90%) related to hypothetical scenarios, Metro policies, technical responses, and candidate motivation, and two (with a weight of slightly over 10%) to the candidate’s experience and education. Maj. Op. at 504-505, 509. The majority disparages the former by characterizing the latter two questions as the “only” ones that “directly addressed the candidates’ experience and education.” Id. at 505. But interview procedures that give more weight to direct evidence of a candidate’s ability to handle problems than to the length of his resume are hardly evidence of discrimination — at least in the absence of evidence that the weighting was unusual.
Moreover, Jaggie’s weighting decisions had no impact on Salazar. If all questions had been weighted equally, Salazar would still have finished in fourth place. More striking, in light of Salazar’s and the court’s focus on “experience,” Salazar still would not have been selected even if the scorers had counted only the two resume questions — unless a scoring error that awarded Salazar 20 points for a question with a maximum allowable score of 10 points went uncorrected (itself, one hopes, a deviation from standard practice). See J.A. 111. Thus, in a contest focused exclusively on Salazar’s “particular strengths,” he could still have won only by means of an scoring error.
Lastly, the majority is “not as certain” as I that Salazar would have lost under virtually any plausible circumstances, because Salazar argues that “by weighing less significant questions more and by minimizing the value of the important questions regarding experience, education and training, the selectee came up with a higher score.” Maj. Op. at 510-11 (internal quotation marks omitted). Salazar did not explain how, but it is possible (as the majority indicates) to reverse-engineer weighting schemes that allow Salazar to emerge the winner (correcting errors and excluding Jaggie’s scores). One obvious scheme would simply ignore all questions except three — the two resume questions noted above, and a third question on WMATA’s Five-Point Pledge. (The pledge reads: “(a) Maintain safe, clean, and attractive facilities and services, (b) Always be courteous, helpful and informative, (c) Strive to provide on time service, (d) Listen and respond to our customers, *515 (e) Be innovative, resourceful, market driven, and entrepreneurial.”) Candidates were asked to state the pledge and explain their role in its implementation. Inclusion of this question (and exclusion of all others) would put Salazar over the top because of the surprising coincidence that the candidate who did better than he on the experience and education questions managed to do worse on the pledge. The majority suggests other schemes in which Salazar could have won, for example, by “halving two questions and tripling two others, by tripling four questions,” or “by dropping three questions.” Maj. Op. at 511. Indeed because question weights are continuous variables, it is theoretically possible to identify an infinite number of weighting schemes from which Salazar would have emerged victorious, and from that trivial epiphenomenon the majority believes the jury could infer discrimination. Thus, it argues, a jury could infer that WMATA’s purpose in giving material weight to questions about technical proficiency, safety, or management of other employees was to “get” Salazar. If such an inference is “reasonable,” judges really are potted plants.
The court correctly points out our salutary rule against considering arguments not raised in the parties’ briefs. Maj. Op. at 510. But WMATA did argue that if Jaggie’s scores and the technical questions were eliminated Salazar would still lose. Appellee’s Br. at 17. That argument is in fact correct (though narrower than the one I’ve made), and Salazar never responded to it except with vague generalities. See Appellant’s Reply Br. at 2-4. The court instead takes up the Reply Briefs assertion that “significant [sic] [meaning, evidently, insignificant] items were weighted heavily.” Id. at 2; see Maj. Op. at 510. Thus the court implicitly endorses Salazar’s characterization of virtually all the questions relating to technical proficiency, safety and employee management as “[in]significant.” Why? In any event, as Salazar presented the argument only in his Reply Brief, I’m unsure why WMATA should be faulted for not responding to it. More generally, when appellate judges confront conflicting claims about the meaning of the record, I had thought it kosher for them — actually, their duty — to look at the record.
Because no single factor cited by Salazar could justify a finding of discrimination, the majority turns to its own somewhat “distorted” weighting scheme — emphasizing the “cumulative effect” of Salazar’s arguments. Maj. Op. at 511. Yet whether considered alone or in sum, the evidence presented is simply not sufficient for a reasonable jury to infer discrimination. The question is “not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.” Anderson, 477 U.S. at 251, 106 S.Ct. 2505 (quoting Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 343, 53 S.Ct. 391, 77 L.Ed. 819 (1933) (emphasis in original)). The evidence must be such that a jury could find not merely that the point in question (here, discrimination) is conceivable; the proof must be such that the jury could — reasonably—find it more probable than not. The majority’s method, effectively requiring WMATA to offer proof absolutely excluding any possibility of discrimination, however remote, is simply not the standard for summary judgment.
In the end, the case boils down to the presence in the hiring process of Jaggie, and thus by extension Lewis. Believing this is too slender a reed to support a jury verdict in Salazar’s favor, I would affirm the decision of the district court.