BROWN, Circuit Judge,
dissenting in part:
If a jury were to find Brian Dwyer discriminated against Myra Hendricks, would we reverse because of insufficient evidence? Read in the light most favorable to Hendricks, these are the facts: (1) *1015 Hendricks was a talented employee who met or exceeded expectations for all aspects of her job; (2) Robert Johnson, who was promoted instead of Hendricks, had a history of good work interspersed with serious misconduct, including losing his government-issued handgun in a bar fight and not immediately reporting the loss, and being suspended for thirty days for misusing his official vehicle (the full details of his unseemly escapade are under seal); (3) Dwyer said the agency’s “downfall” was “hirfing] women” and his office ought to have more “men,” and he justified boorishness because the offending employee “was hired in an all male law enforcement workforce in the 1970s”[1]; and (4) a SIID supervisor, Jacqueline Colonna, declared the office had “girl jobs” and “boy jobs,” with women being “tasked with analytical assignments” while men received “high profile matters.” Because a jury could find for Hendricks on these facts, I respectfully dissent from my brothers’ affirmance in toto, though I concur as to the March 2003 nonpromotion.
I do not quarrel with the majority’s conclusion that if Johnson’s history of misconduct is not considered, then he was at least as qualified as Hendricks, and probably more so. But why would a reasonable juror not consider his history? Common experience tells us that Johnson’s personnel file could have been a dealbreaker if someone had wanted it to be. After all, in a holistic appraisal of who is better qualified, it is relevant that only one candidate has a checkered past, as a disciplinary record says something about who a person is and what kind of employee he or she will be. Integrity and personal probity, moreover, should be especially salient to the promotional prospects of law enforcement officers, for, as a senior TIGTA official put it, “we’re in the integrity business.” Thus, a reasonable jury could conclude discrimination played a role in Johnson’s promotion because he alone had exhibited a marked proclivity for bending the rules, and he was not otherwise substantially better qualified than Hendricks. Think about the issue this way: Imagine Johnson was a woman and Hendricks a man, and Dwyer said Ms. Johnson would not be promoted because of her past misconduct, resulting in Mr. Hendricks being promoted instead. Would Ms. Johnson have a viable Title VII claim? This is a difficult question because notwithstanding her otherwise superior credentials, the presence of serious misconduct, an anti-qualification, adds a different dimension to the comparison. In other words, we would not be surprised if Dwyer were to say: “Sorry Ms. Johnson, but I do not want anyone with your baggage in my department.” But here, to Mr. Johnson, Dwyer said nothing of the sort. Why not?
To answer that question, the majority notes Dwyer’s supervisor allegedly said that because Johnson fulfilled his punishment, promoting him was not a problem. But even in Dwyer’s account of that conversation, his supervisor never said the misdeeds were irrelevant, suggesting they only were not disqualifying. This distinction -is a familiar one, as often even a serious deficiency can be offset by other compelling considerations. Randy Johnson, for instance, has hit a dreary .125 for his career, but his Cy-Young-winning slider covers a multitude of batting-box sins. See Randy Johnson, http://www.baseball reference.eom/players/j/johnsra05.shtml (last visited June 1, 2009). Robert Johnson is no Randy Johnson. Even if apart from this misconduct he was better quali *1016 fied than Hendricks, he was not so much better qualified that a court-sitting-as-reasonable jury can conclude Hendricks’ non-selection was free of discriminatory taint. Instead, this is a quintessential question of fact, appropriate only for an actual jury to decide. “Although a jury may ultimately choose to believe the [agencyj’s explanation of events rather than [the plaintiffs], at this stage we refrain from making credibility determinations, weighing the evidence, or drawing inferences from the evidence — these, after all, are jury functions, not those of a judge ruling on a motion for summary judgment.” Jones v. Bernanke, 557 F.3d 670, 681 (D.C.Cir.2009). See also Montgomery v. Chao, 546 F.3d 703, 706 (D.C.Cir.2008) (“We must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence.”); Fed.R.Civ.P. 56(c).
The government also argues Dwyer properly ignored Johnson’s misdeeds because they did not relate to “integrity.” This seems a preternaturally narrow definition of the term, particularly given Johnson’s deliberate misuse of the vehicle entrusted to him. Can it really be true that any prior act — provided it involves neither illegality nor outright lying — is irrelevant to one’s prospects for promotion? What if Johnson were reprimanded for being drunk every afternoon? Or for writing a trashy romance novel at the office? In any event, this “integrity” standard is applied at best intermittently, as Dwyer transferred an employee out of SIID for misconduct unrelated to lawbreaking, or lying. Moreover, Dwyer’s hostility to women, which our procedural posture requires us to accept as established, further confirms a reasonable jury could find for Hendricks on this record. See, e.g., Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1295 (D.C.Cir.1998) (en banc) (“A plaintiff attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of-the successful candidate.”); Czekalski v. Peters, 475 F.3d 360, 368-69 (D.C.Cir.2007) (an employer’s “disparaging comments” “in conjunction with strong evidence of pretext” creates a jury question).
The majority also faults Hendricks for not presenting evidence that she was better qualified than the other applicants who also were not promoted. No authority is cited for this proposition, for there is none to cite. We do not require a Title VII plaintiff to compare herself to anyone but the person actually selected for the position. E.g., Aka, 156 F.3d at 1294 (comparing “plaintiffs qualifications and those of the successful candidate”). Here, I have no idea why Dwyer did not select Michael Radetic, and neither does the majority. See Maj. Op. at 1014. It could be Dwyer found Radetic annoying, and though Dwyer did not want to hire a woman, he wanted to hire an annoying person even less, so he hired Johnson. Who knows? What the record does show, however, is Dwyer had a problem with women agents and decided to promote a male with a sullied record even though a qualified female with a pristine record was available. We ought to let the jury decide what inference to draw.
If used carefully, our “significantly better qualified” doctrine can accurately reflect the real world. In this case, unfortunately, I fear the majority opinion has myopically applied the doctrine in a way that just doesn’t jibe with reality. Because Johnson was better qualified according to the traditional categories, the majority affirms, even though Johnson’s bad behavior mingled with Dywer’s alleged misogyny makes this an untraditional case. With summary-judgment facts like these, a jury of her peers — not a panel of *1017 judges — ought to decide the merits of Hendrick’s claim.

. Indeed, Dwyer suggested "[i]t was only when women were hired in law enforcement that men had to change the way they behaved,” and the man’s "actions would have been tolerated by other males.”