WILLIAMS, Senior Circuit Judge,
concurring in the judgment:
I join the majority in finding that under the procedure originating in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the government is not entitled to summary judgment on Evans’s claim regarding the LDDS position (and also in finding that it is so entitled regarding the “detail” as executive assistant to the Commissioner). My route to this conclusion is more direct than that of my colleagues. They find that while the government offered a legitimate, non-discriminatory explanation for its actions, the self-contradictions in its evidence were a sufficient basis for a jury reasonably to conclude that the explanation was pretextual'and that in fact the actions were driven by discriminatory motives in violation of Title VII. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Aka v. Washington Hospital Center, 156 F.3d 1284 (D.C.Cir.1998). I conclude that once we identify the critical government action, the government’s problem is that it has offered no explanation at all.
The events culminating in Evans’s failure to secure the promotion involve two quite separate elements: a “hiring freeze,” which delayed but did not formally doom the promotion, and the cancellation of the position, which extinguished the possibility altogether. Evans indisputably suffered eight-or nine months in limbo, from her selection for the LDDS position on July 17, 2001 to April 3, 2002, when she concluded that the government had in fact cancelled the position (which evidently occurred March 7). During all this time Evans remained interested in the position, so much so that she “unretired” in early March 2002 on the false premise that the position was still available and her promotion certificate was still valid. It was only after HHS told Evans that the position had been abolished that she assessed the situation as hopeless arid retired permanently. See Evans Aff. at 4.
With respect to the delay (which Evans does not appear to identify as an independent violation of her rights), memoranda offered by the government document the existence and evolution of the hiring controls and unquestionably satisfy the requirement, elucidated by the Supreme Court in its applications of McDonnell Douglas, to “produc[e] evidence that the adversé employment actions were taken for a legitimate nondiscriminatory reason.” St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal quotations removed); see also Texas Dep’t. of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If accepted by a trier of fact, the memoranda would justify a finding that unlawful discrimination was not the cause of the eight-month window during which Evans waited in vain.
But while the government has spoken of the hiring freeze as the explanation for both the delay and the cancellation, it. is hard to spot its relevance to the cancellation. One can imagine such a link. The government might, for example, have introduced evidence of an HHS. policy under which vacancies are to be annulled whenever prolonged beyond some set period, or perhaps a rule automatically dispatching any newly created position (such as the one awaiting Evans) that goes unfilled too long.
*625 But the government has offered nothing of the sort. In fact, it seems unable even to provide a clear and coherent account of who ordered the cancellation, much less why. Surprisingly, in light of the standard bureaucratic practice of having a form for every action and at least a check-box for the reason, it has not even produced a contemporaneous written .record establishing that the cancellation did in fact occur on March 7, 2002, much less a contemporaneous explanation. Of course contemporaneity is not required (though obviously it would add credibility), but the government has never, even in this proceeding, supplied evidence giving an explanation. The best it seems to be able to do is to use its brief (not sworn evidence) to characterize the cancellation as “essentially ministerial” and say. that the LDDS position “died a quiet administrative death,” Gov’t Br. 22, 25. But given the lack of evidence explaining what rules or actions generate such deaths, these are not explanations at all. The resulting deficiencies would seem to preclude a finding that the government has “clearly set forth, through the introduction of admissible evidence, reasons for its actions.” Hicks, 509 U.S. at 507, 113 S.Ct. 2742 (internal quotations removed).
My colleagues take a different approach and view the case as turning on the sufficiency of Evans’s evidence of pretext. In pursuing this inquiry, they reason in the shadow of two decisions, Reeves and Aka, which they rightly regard as controlling their analysis. “Control” may not be quite the right word, however. The two decisions draw a line, but with a roller brush rather than a fine-line marker. This case seems to me to he somewhere within that broad swath.
Reeves and Aka hold that in a federal employment discrimination case, where the employee has the burden of establishing that the defendant’s action was motivated by the protected trait in question (e.g., race, sex, age), and the employer has offered an innocent justification, proof “that the defendant’s explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.” Reeves, 530 U.S. at 147, 120 S.Ct. 2097 (emphasis added). Indeed, it may be so persuasive that, where there is no evidence of rebanee on the protected trait other than the undermining of the defendant’s explanation, the district court, at least sometimes, may not grant judgment as a matter of law against a jury finding of discrimination, id. at 148-49, 120 S.Ct. 2097, or, more or less equivalently, may not grant summary judgment for the defendant on the theory that there are no disputed issues of material fact, Aka, 156 F.3d at 1288.
Both the Reeves and Aka courts recognized that mendacity in the employer’s explanation strengthened any inference of reliance on the protected trait, but both indicated that evidence supporting a finding of mendacity was not essential. Reeves, 530 U.S. at 147, 120 S.Ct. 2097; Aka, 156 F.3d at 1293-94.
Both courts also recognized the existence' of situations where the inference from impeachment of the employer’s explanation would not be enough, but the fact patterns given as examples, originally in Aka and adopted by the Court in Reeves, seem chosen for their improbability. One is the case where the plaintiff’s evidence undermines defendant’s proffered explanation, only to supplant it with another innocent explanation. The second is the case where the undermining evidence is “weak” and “there is abundant independent evidence in the record that no discrimination has occurred.” Id. at 1291; *626 Reeves, 530 U.S. at 148, 120 S.Ct. 2097 (following and citing Aka).
Thus at its potential outer edge, the principle allows the plaintiff to get to the jury so long as he or she can point to any snippet of evidence drawing the defendant’s explanation in question. Perhaps utterly trivial snippets are inadequate: a conflict among defendant’s witnesses over the color of tie worn by one of them at a critical meeting? But one hesitates to speak firmly on such a hypothetical; after all, comparable impeaching evidence is quite standard among criminal defense attorneys’ efforts to establish a reasonable doubt in jurors’ minds.
The majority’s decision illustrates the range and variability of the Reeves-Aka framework. To meet her burden of demonstrating that the government’s explanation was pretextual, Evans has drawn attention to omissions and inconsistencies among the statements of various HHS representatives about why her promotion stalled. Specifically, Evans points to HHS’s failure to clarify, both to her and to then-Senator Paul Sarbanes, that after November 2001 Evans could have been placed in the LDDS position had the responsible officials secured the approval of Assistant Secretary Wade Horn or Assistant Secretary Ed Sontag — an option created by a relaxation in the controls that permitted the promotion of the three white employees. Evans also notes that HHS has been unable to provide a clear and consistent account of who cancelled the LDDS position. Finally, Evans alleges that HHS human resources personnel promised her that she would be placed in the LDDS position after the hiring freeze had been lifted, and that multiple HHS employees gave false assurances that the LDDS position was still available and Evans’s promotion certificate still valid in the week prior to the date HHS now contends the position was canceled.
The evidence Evans marshals does not paint a flattering portrait of bureaucracy. It demonstrates that scattered HHS officials were unable to speak with one voice about the precise relationship between the hiring controls and the LDDS position, and about the precise mechanism by which the position'was cancelled. It also supports the (one would imagine uncontroversial) thesis that a capable attorney will have little trouble teasing out discrepancies in thé accounts of various bureaucratic actors pertaining to personnel actions affecting non-managerial employees — actions that, while understandably of great concern to the affected employees, seem likely to be submerged -among a host of similar or more vital issues demanding the attention of senior-level officials and human resources personnel. It is no accident that the “n” in snafu stands for “normal.”
What the evidence stressed by Evans does not establish is the falsity of the government’s basic account of the circumstances that delayed Evans’s expected promotion. For reasons already stated, there is no reason to doubt that had there been no hiring controls, Evans would have been placed in the LDDS position upon her selection in July 2001. Even in their relaxed form, the controls for a time created a presumption against promotions to GS-14 positions. (Evans has not advanced any contention that the three promoted women should be viewed as candidates for a post equivalent to the LDDS position.) The promotion of three white individuals does not, in and of itself, establish that by late 2001 the controls had become a charade and had ceased to have any legitimate application. Rather, the promotions prove only that the restrictions were not an impermeable barrier — a fact which adds nuance, but which is nonetheless consistent *627 ■with the government’s account. Evans s evidence is at most a reason to regard the government’s initial explanation as imprecise; neither Reeves nor Aka gives a clue how grave an imprecision must be to qualify as “sufficient evidence for the trier of fact to disbelieve” the proffered explanation. Reeves, 530 U.S. at 137, 120 S.Ct. 2097.
As for the cancellation of the position itself, the accounts of who cancelled the LDDS position conflict. As noted earlier in this opinion, the government never offered any affirmative reason at all for the cancellation; the conflict over exactly whose fingerprints may be on this unexplained event tells little one way or the other.
Yet the majority finds that Evans is entitled to a jury trial under Reeves and Aka. That is because those two cases allow, but do not require, a court to find pretext on the basis of even the mildest inconsistency in the defendant’s explanation for its actions. The perverse effects of this doctrine should be plain: District courts are at risk of seeing summary judgments reversed in all cases except those in which the defense witnesses and all documentary evidence sing in perfect harmony (which itself might, ironically, be cited as evidence of chicanery). Defendants, wary of jury trials and apprehensive of the cost of litigation, and commonly facing an appealing plaintiff and the prospect of a jury, may be inclined to settle even weak cases. Such a regime invites frivolous suits and rulings that defy harmonization.